682 So.2d 331 (1996)
J.A.G.
v.
Bernard SCHMALTZ, The Roman Catholic Church of the Archdiocese of New Orleans, Inc., St. Clement of Rome Church, Presentation Sisters, Inc.
No. 95-CA-2755.
Court of Appeal of Louisiana, Fourth Circuit.
October 23, 1996.
Rehearing Denied November 22, 1996.
*332 Richard Ducote, Fine and Associates, New Orleans, for Plaintiff/Appellant, J.A.G.
Vincent T. LoCoco, New Orleans, for Defendant/Appellee, Bernard Schmaltz.
C. William Bradley, Jr., Dwight C. Paulsen, III, Lemle & Kelleher, L.L.P., New Orleans, and Don M. Richard, Denechaud and Denechaud, New Orleans, for Defendants/Appellees, The Roman Catholic Church of the Archdiocese of New Orleans, the Congregation of St. Clement of Rome Roman Catholic Church and the Presentation Sisters, Inc.
Before LOBRANO, LANDRIEU and MURRAY, JJ.
MURRAY, Judge.
J.A.G., a thirty-two-year-old male claiming a recent recovery of certain childhood memories, filed this suit in December 1992, seeking damages for alleged sexual abuse committed in 1974 by Father Bernard Schmaltz, a Roman Catholic priest. In addition to Father Schmaltz, the named defendants included the Roman Catholic Church of the Archdiocese of New Orleans, the Congregation of St. Clement of Rome Roman Catholic Church and The Presentation Sisters, all of whom excepted to the suit based upon prescription. After extensive discovery, an evidentiary hearing was held, resulting in a judgment maintaining the defendants' exceptions and dismissing J.A.G.'s claims with prejudice. J.A.G. now appeals; we affirm.

FACTS
J.A.G. asserts that in October 1973, while he was an eighth-grade student at St. Clement of Rome Elementary School, Father Schmaltz took him, his brother and another boy on a fishing trip to Slidell. During the night, while sharing a bed in a motel room, Father Schmaltz fondled J.A.G.'s genitals and slightly penetrated his anus with his fingers.[1] J.A.G. told his brother and the other boy the next morning about this incident, which was his first sexual encounter. They dismissed it. Over the next month or so, Father Schmaltz continued to occasionally *333 touch J.A.G. inappropriately during chance encounters in church or the hallways, but there were no additional overt sexual acts. However, during this same period, J.A.G. began having sexual encounters with an older man on his paper route.
Sometime shortly before Christmas 1973, apparently based upon `talk around the schoolyard', one of the Presentation Sisters approached J.A.G. and asked if Father Schmaltz had ever touched him in an unusual way. He told her yes and briefly described what had happened in Slidell. The nun set up a meeting with the Parish Pastor, J.A.G., and two or three other boys, and the students' allegations of Father Schmaltz's conduct was discussed. No parents were notified of this meeting; the boys were told not to tell their parents, and "not to let it leave this room." After the meeting with the Pastor and the other boys, J.A.G. testified, the schoolyard talk about "Father Bernie" continued, but no action was taken.
Allegedly with no recollection of any other incidents involving Father Schmaltz, J.A.G. continued his education at a Catholic high school and university. He testified that he was sexually active, if not promiscuous, with both men and women throughout this period. In the fall of 1982, J.A.G. enrolled in law school but was dismissed after the spring 1983 semester due to poor academic performance. His petition for readmission, which detailed a number of recent personal and emotional problems, was denied. In the fall of 1988, he was accepted into medical school, but voluntarily resigned in the middle of the next semester, citing personal and psychological difficulties. He was readmitted in the fall of 1990, however, based upon his representation that he was seeing a psychiatrist to work through some longstanding psychological problems.
In fact, J.A.G. had begun intermittent psychiatric treatment in May 1983, when he consulted Dr. Daniel K. Winstead at Tulane University Medical Center, asserting that he was having difficulty dealing with the loss of a girlfriend, his failure in law school and a recent automobile accident. In the initial session with Dr. Winstead, J.A.G. disclosed that he had had a "sexual incident" with a priest when he was 13 years old. No details of the incident appeared in the doctor's notes. J.A.G. last saw Dr. Winstead in August 1983 after only eight visits; the doctor's notes do not reflect any further discussion of sexual matters.
In December 1984, J.A.G. began a limited course of treatment with Dr. Jose M. Pena, who was also on the psychiatry staff at Tulane University Medical Center. On his fifth visit, in March 1985, J.A.G. told Dr. Pena that he had been sexually abused by a priest when he was in the eighth grade, but that his parents did not believe him at first. According to the doctor's notes, J.A.G. associated the sexual abuse by the priest with his subsequent promiscuity, indicating he "knew something was wrong." On the next visit, in April 1985, Dr. Pena wrote that "his rape + molestation" contributed to J.A.G.'s emotional difficulties, and the notes from the following session indicate discussion of watching a show about a child molester and opening up to his father about his "molestation." Dr. Pena explained, however, that these session notes were not a verbatim transcript, but only his written record of matters discussed during each visit. Therefore, J.A.G. may have used the word "rape" or Dr. Pena may have written it as a brief expression for abuse in general. Because he last saw J.A.G. in June 1985, Dr. Pena had no independent recollection of the details of abuse that had been provided.
J.A.G. testified that he also saw psychiatrist Dr. Charles G. Steck for about eight weeks in 1986 or 1987, and consulted with Dr. Carl Balson before he resigned from medical school in 1988. Dr. Balson referred J.A.G. to Dr. Howard J. Osofsky of the LSU Medical Center, with whom a five-year course of psychoanalysis, with four sessions per week, was begun November 16, 1988. J.A.G. testified that although he sought treatment because of his poor performance in school, Dr. Osofsky was the first psychiatrist with whom he was comfortable enough to fully discuss his homosexual encounters, not just his sexual promiscuity. In J.A.G.'s words, his homosexual relationships were "just something I didn't want to talk about or have come to the light of day."
*334 J.A.G. testified that in December 1992, after several years of psychotherapy and while up late studying for a medical school exam, he saw a local news story on a cable TV channel regarding sexual misconduct by a Roman Catholic priest. He watched the broadcast three times, unable to turn it off, then went to bed "feeling very, very uncomfortable." He awoke suddenly with the physical sensation of Father Schmaltz on top of him, and gradually remembered being anally raped by the priest. Over an unstated period of time, with Dr. Osofsky's help, J.A.G. recalled that in May 1974, while the rest of his class was on a field trip, he was made to remain at school and was sent to work in the rectory by one of the nuns. Father Schmaltz saw J.A.G. stapling programs there and invited him upstairs `to talk' while the priest changed clothes. It was then that the priest allegedly raped J.A.G.
Dr. Osofsky testified that J.A.G. revealed the initial Slidell incident with Father Schmaltz soon after their sessions began, and it was discussed frequently in his further treatment. Then, several years later, J.A.G. described a totally different, coercive experience involving being detained at school and sent to the rectory, where the priest's penis was placed against his anus; as the doctor recalled, however, there had been no anal penetration. This revelation came at a time when Dr. Osofsky had noted J.A.G.'s greater stability and increased attempts at exercising control over his life. Additionally, according to Dr. Osofsky's recollection, this second incident was first discussed after J.A.G. had begun to contemplate legal action and at a time when there was increasing publicity about clergy molestations of parishioners.[2]
J.A.G.'s suit was filed December 28, 1992, the same month in which he said he recalled the rape. Dr. Osofsky terminated J.A.G.'s treatment in October 1993, primarily because he felt the disclosure demands of the pending lawsuit would be inconsistent with a continued relationship; he also felt J.A.G. "was ready." Dr. Osofsky testified that although painful memories can be suppressed for varying lengths of time, he could not state with confidence whether or not that occurred in this case. In his opinion, determining whether a recovered memory is of an actual event, a manipulation, or even a fantasized memory is best judged by the context in which it is brought up. In this case, Dr. Osofsky stated, he had himself questioned why the Slidell incident had been discussed repeatedly, but not the later event.

ADDITIONAL TESTIMONY AND EVIDENCE
In addition to the factual testimony outlined above, the parties presented expert testimony and evidence regarding the dynamics of child sexual abuse and its effect on memory. All of the testifying experts generally agreed with the American Psychiatric Association's "Statement on Memories of Sexual Abuse" dated December 12, 1993, which was admitted as Exhibit P-9 and provides in part:
Children and adolescents who have been abused cope with the trauma by using a variety of psychological mechanisms. In some instances, these coping mechanisms result in a lack of conscious awareness of the abuse for varying periods of time. Conscious thoughts and feelings stemming from the abuse may emerge at a later date.
There was some disagreement, however, concerning the importance of the terminology repression, suppression, or cognitive avoidanceused to describe the coping mechanisms referenced in the Statement. Because the parties and the court below fully clarified the distinctions between the terms when material, this opinion will use `memory suppression' as a general expression regarding J.A.G.'s claimed loss of recollection of the incident at issue.
The trial court heard the testimony of Dr. David Corwin, a psychiatrist accepted as an expert in sexual abuse of children and resultant *335 memory suppression, as well as Dr. Gene L. Usdin, qualified as an expert in psychiatry. Both Dr. Corwin and Dr. Usdin, using literature on the topic, explained that children abused before the age of six are more likely to exhibit memory suppression, and that the likelihood decreases the older the child is when the incident occurs. The studies showed that suppression is infrequent in children molested between the ages of twelve and eighteen. Both agreed that the most traumatic events generally are the last to be remembered as well as the last to be disclosed by victims of child sexual abuse. Both also agreed that rape would be more traumatic than an incident of fondling.
In Dr. Corwin's opinion, J.A.G.'s account of suppressing only the memory of the May 1974 rape was consistent with the research in the field, which shows that such partial recall has been reported in "significant percentages" of sexually traumatized individuals. Additionally, he found J.A.G.'s description of what triggered the memory, as well as the gradual recollection of details that followed, compatible with clinical studies he had reviewed. Dr. Corwin further testified that the history of sexual "acting out," but yet failing to disclose his homosexual encounters or fully discussing his promiscuity with his psychiatrists, indicated to him that J.A.G. was attempting to avoid dealing with the rape. Finally, Dr. Corwin indicated that the fact that J.A.G. was instructed by the Pastor and the nun not to disclose the initial incident with Father Schmaltz provides further support for his suppression of the priest's later abuse.
Dr. Corwin conceded, however, that most sexually abused individuals will recall the trauma when they become desensitized to sex. He therefore agreed that J.A.G.'s history of sexual encounters with an older man on his paper route, which fell between the two incidents with Father Schmaltz, was inconsistent with some research in the area of memory suppression. Additionally, Dr. Corwin emphasized that he was not giving an opinion on whether or not J.A.G. had, in fact, suppressed this memory; he felt that determination rested on an assessment of J.A.G.'s credibility, which was not within his professional duties. Dr. Corwin could only state that the history given by J.A.G. "is consistent with what's known and what I've seen in sexually traumatized people."
In contrast to Dr. Corwin's opinion, Dr. Usdin concluded that J.A.G.'s claim of total suppression of only the rape for eighteen years was inconsistent with the studies and with J.A.G.'s history. He based his conclusion in part on the other sexual incidents, both with the priest and the other man, that preceded the rape and the fact that J.A.G. was fourteen when it occurred. These factors, as well as the increased exposure to sex present in today's society, were said to indicate a desensitization that would have triggered an earlier recollection of the rape. Dr. Usdin also considered Dr. Pena's use of the word "rape" in his 1985 session notes significant, and further testified that he had found J.A.G. "somewhat unreliable" during his two interviews. While Dr. Usdin agreed that a forcible rape, especially by a religious authority, would likely create significant psychological damage, he knew of no other reported case involving total suppression of a major trauma for such an extended period of time. Therefore, although the memory may have been suppressed "from time to time," Dr. Usdin was of the opinion that J.A.G. "had an active accessible memory of the rape by Father Schmaltz" for most of the period between May 1974 and December 1992.
A different perspective was offered by the testimony of Dr. L. Mulry Tetlow, a former priest, who was accepted as an expert clinical psychologist with an emphasis on sexual abuse by priests. Dr. Tetlow stated that he has worked with patients abused by clergymen and that he includes research in this field in several college courses he teaches. Additionally, of approximately one hundred patients in his private psychotherapy practice, which is centered on victims of child abuse, he had treated ten or twelve individuals reporting a "recovered" memory. In Dr. Tetlow's opinion, both the reaction to J.A.G.'s report of the initial incident with Father Schmaltz and the dynamics of Roman Catholic doctrine provided powerful psychological motivations for the suppression of only the May 1974 rape. According to Dr. Tetlow, a *336 Catholic boy just reaching puberty would perceive Father Schmaltz's acts as not just sexual abuse, but something akin to incest because of a priest's standing in the Church. Additionally, both the Parish Pastor and the nun responded to J.A.G.'s report of the first molestation not by taking action against the priest, but by instructing J.A.G. not to tell anyone. Then, against this background, J.A.G. was sent to work alone in the rectory by another nun perceived to know of Father Schmaltz's prior conduct, resulting in J.A.G.'s rape. In this context, Dr. Tetlow testified, the prior instruction not to tell about "Father Bernie's" acts would be translated into the psychological mechanism of denial: don't think about it; it did not happen. The real trauma to J.A.G. was therefore not sexual, but a betrayal by the religious figures he had trusted, differentiating the May 1974 rape from his other sexual experiences that year.
Also based on this distinction, Dr. Tetlow disagreed that J.A.G.'s later promiscuity would have desensitized him and triggered an earlier recollection of the event. To the contrary, Dr. Tetlow found the timing and circumstances of J.A.G.'s recovery of the memory to be entirely consistent with psychological theory. In his opinion, suppression of the memory allowed J.A.G. to survive for years, until the psychotherapy permitted him to deal with it and the social and legal climate seemed to make it possible for him to do something about it.

DISCUSSION
Although J.A.G's petition, as amended, claims damages for all alleged acts of molestation during 1973-74, he testified unequivocally that he never forgot the initial incident with Father Schmaltz in Slidell. As his attorney has conceded in his brief, the sole issue presented to the trial court was whether J.A.G.'s claim for damages arising from the May 1974 rape has prescribed.
Liberative prescription runs against all persons, including minors and incompetents, unless an exception is established by the legislature. La.Civ.Code Ann. arts. 3467-68. The one-year prescriptive period for delictual actions generally begins to run from the date of injury or when the damage is sustained. La. Civ.Code Ann. art. 3492. This prescription statute is strictly construed in favor of the obligation sought to be extinguished by it. Wimberly v. Gatch, 93-2361, p. 8 (La.4/11/94), 635 So.2d 206, 211, and cases cited therein. If the face of the petition shows the prescriptive period has already elapsed, the plaintiff has the burden of establishing that suspension, interruption or renunciation of prescription has occurred. Id.
Despite the lapse of more than eighteen years since the incident at issue, J.A.G. contends this suit was timely filed under the judicially created doctrine of contra non valentem agere nulla currit praescriptio: prescription does not run against a party unable to act. The Supreme Court has described four general categories of circumstances in which this suspensive doctrine applies:
1. Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
2. Where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
3. Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
4. Where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.
Wimberly v. Gatch, 93-2361, p. 9, 635 So.2d at 211, and cases cited therein.
J.A.G. contends that prescription on his claim was suspended under either or both of the latter two categories of contra non valentem. He argues that the third category applies here because the evidence shows his suppression of all memory of the rape was a direct result of Father Schmaltz's tortious conduct. Even if the causative link between the priest's abuse and the suppression was not shown, J.A.G. asserts, the fourth category of contra non valentem suspended prescription because the evidence established *337 that he did not know of his cause of action until the month in which this suit was filed.
The trial court, however, entirely rejected the application of contra non valentem in this case and maintained defendants' exception of prescription. In written Reasons for Judgment, the court explained that "plaintiff has not shown by a preponderance of the evidence that he repressed, suppressed or avoided all memory of the alleged rape until December, 1992." Thus, the court implicitly found that J.A.G. had a conscious recollection of the event at some point prior to December 28, 1991. Because this finding is essentially factual, the trial court's judgment must be affirmed unless it is clearly wrong or manifestly erroneous in light of the record in its entirety. Stobart v. State Through Dept. of Transp. & Dev., 617 So.2d 880, 882 (La.1993). The reviewing court may not disturb reasonable evaluations of credibility and factual inferences that are supported by the evidence, even though it feels its evaluations are more reasonable. Welch v. Winn-Dixie Louisiana, Inc., 94-2331, p. 14 (La.5/22/95), 655 So.2d 309, 316. If two permissible views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
J.A.G. argues that the trial court placed undue emphasis on the failure of any of the experts to testify with any certainty that J.A.G. had, in fact, suppressed the memory at issue. He points out that only the defense expert, Dr. Usdin, found his claim of memory suppression inconsistent with the research, while the two "better qualified" experts he presented testified more favorably. J.A.G. asserts that the court's reliance on the absence of positive evidence represents manifest error and requires reversal of the judgment.
However, we find that the district court, after noting there was no decisive opinion, properly reached its decision by weighing the qualifications of the experts and those factors cited as supporting their conflicting conclusions. Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 5 (La.1/29/96), 666 So.2d 1073, 1077. Because even uncontradicted expert testimony is not binding on the factfinder, Sanders v. Wysocki, 92-1190, p. ___ (La.App. 4th Cir. 1/27/94), 631 So.2d 1330, 1334, writ denied, 94-0506 (La.4/22/94), 637 So.2d 156-57, the acceptance of one expert's opinion over that of two others does not represent an abuse of discretion.
J.A.G. further argues that the trial court relied on conjecture, rather than a proper view of the evidence, in reaching its decision. For example, he notes that the Reasons for Judgment indicate that the court considered it significant that he had made a prior disclosure to Dr. Winstead of a "sexual incident" with a priest when he was thirteen and that the word "rape" appeared in Dr. Pena's 1985 notes. J.A.G. points out, however, that Dr. Pena testified that "rape" was not necessarily the term used by J.A.G., so this should not be construed against him. In addition, J.A.G. asserts that it was error to conclude that his earlier disclosure of a sexual incident with the priest indicated that he had not suppressed the memory of the rape. Rather, he contends that disclosure of a sexual incident involving the priest with no mention of a rape is consistent with his having suppressed that particular memory.
The transcript shows that both Dr. Pena and Dr. Winstead testified that their notes did not expressly indicate, nor could either recall, if J.A.G. had said he was raped by a priest. Because neither doctor could interpret his notes with any certainty, and considering the allocation of the burden of proof, the trial court reasonably could conclude that J.A.G. failed to show he had not disclosed the rape during these sessions in the early 1980s. Thus, the asserted discrepancies merely demonstrate that there are two equally reasonable views of this testimony, and the trial court chose the view that was adverse to J.A.G. In such a situation, the factfinder's choice cannot be manifestly erroneous. Winn-Dixie Louisiana, 94-2331, p. 14, 655 So.2d at 316.
In addition to these findings, our review of the record as a whole establishes that, while this Court might have decided differently, there is ample support for the trial court's decision that J.A.G. had not carried his burden of proof. Although two experts found that a suppression of memory in this case *338 was consistent with theory and research in the field, these opinions must be weighed against Dr. Osofsky's expressions of doubt on the issue. This psychiatrist, whose five-year treatment of J.A.G. included the critical point in time at issue here, noted that the context of an alleged recovery of memory is important in assessing its validity, and further testified that discussions of possible legal action against Father Schmaltz had preceded J.A.G.'s disclosure of the rape. Additionally, as mentioned by the district court, there were apparent discrepancies between J.A.G.'s trial testimony and the information he had provided to his doctors and the expert witnesses, a factor that is properly considered when evaluating the resultant opinions. Given this testimony and evidence, we cannot conclude that the trial court was manifestly erroneous or clearly wrong in deciding that J.A.G. failed to prove he had no memory of the May 1974 rape until December 1992.[3] Consequently, the doctrine of contra non valentem is inapplicable. The trial court correctly maintained the defendants' exceptions of prescription.
AFFIRMED.
NOTES
[1] The parties stipulated that, only for the purpose of deciding the exception, it could be assumed that the alleged acts of abuse occurred.
[2] Dr. Osofsky testified by deposition, which was admitted as exhibit P-2. Although it is apparent that his dated session notes were reviewed during questioning, these notes were neither attached as a deposition exhibit nor admitted at the trial on the exceptions. Because Dr. Osofsky's testimony includes no specific date for J.A.G.'s initial disclosure of the rape, there is no evidence to indicate precisely when this occurred; Dr. Osofsky believed it was in 1993.
[3] As plaintiff concedes, absent suppression of the memory of the rape, there is no other basis for the application of contra non valentem to suspend prescription in this case. J.A.G. admits he had continuous, active memories of the priest's initial act of sexual abuse, and Dr. Pena's notes suggest that by 1985, J.A.G had linked this abuse to his subsequent problems. Also, J.A.G. had no contact with Father Schmaltz or St. Clement of Rome school after 1974, and no action by the defendants was alleged to have prevented an earlier suit.