h MURRAY, Judge.
Carrie Ola Brown, curatrix of Joyce J. Brown and tutrix of Joyce Brown’s minor son, seeks review of the district court’s determination that neither the City of New Orleans (the City) nor its off-duty police officer, Reginald Williams, is liable for the injuries Joyce Brown suffered when she was accidentally shot as the officer attempted to stop an armed robbery. We affirm the trial court’s judgment of dismissal.
FACTS AND PROCEEDINGS BELOW
At about 3:00 a.m. on November 24, 1987, Joyce Joann Brown was the sole employee on duty at the Steak & Egg Kitchen on Carroll-ton Avenue in New Orleans. Also present were John W. Yerks, Jr. and Ann Mack, sitting next to each other at the service counter, and Reginald Williams, who was an off-duty j2New Orleans police officer dressed in street clothes, sitting alone at a booth in a far front corner of the eatery.
According to Mr. Yerks, this incident began when a man wearing a long pea coat, stocking cap, and a long white Santa Claus beard came into the Steak & Egg with a .38 caliber gun in his right hand. The gun, although raised up, was not pointed at anyone in particular. This man told everyone to stand and empty their pockets, and then walked in the direction of Officer Williams to get around the counter to the cash register. The robber stood behind the counter next to Ms. Brown and told her to open the register; the gun was in his right hand and was pointed in Ms. Brown’s direction. Mr. Yerks testified that at no time was the gun pointed at *522 her head. Everyone stood up and began emptying their pockets, as they had been instructed.
Mr. Yerks testified that he watched Reginald Williams, who he knew was a police officer, put his wallet on the table.[1] Officer Williams then pulled out his gun and began easing toward the counter, approximately eight feet away, stopping at the wall where the gunman had turned. According to Mr. Yerks, the robber was still trying to get Ms. Brown to open the register at this point, and he had dropped the hand with the gun down by his side. When the robber moved slightly away from Ms. Brown, Officer Williams fired at him. Officer Williams did not give a warning before firing.
Mr. Yerks’ testimony as to what happened next was some what confused. He first testified that the robber went down behind the counter after Officer Williams fired. Mr. Yerks said he then leaned over the counter to see if the |3robber had been hit, but dashed for the door and went for help when the robber came up again. However, Mr. Yerks later agreed that “after that one shot [he] literally ran over Miss Mack to get out the door.” He remembered hearing only one shot, even when running away.
Mr. Yerks did not believe that the robber was aware that Officer Williams had moved from the table to the end of the counter. Mr. Yerks testified that, from his viewpoint, the officer had a clear shot at the robber at the time he fired, and that his shot was aimed at the robber, not up in the air as a warning shot. Mr. Yerks expressed relief that Officer Williams had decided to act. He testified that “all of us in there that particular morning, we were in jeopardy when this happened, so yes, he was, he was shooting at the robber.... I [knew] when [the man] walked in the door with the gun in his hand he meant business.” He explained that because there were only four people in the restaurant, he had feared that the robber might shoot them all once he obtained their money.
Reginald Williams, now the Chief of Xavier University’s security force, graduated from the Police Academy in 1975 and served as a patrol officer until 1977. He was next assigned as a Crime Prevention officer, acting as a liaison with the community and assisting in the formation of Neighborhood Watch groups. He earned a Bachelor of Science degree in criminology from Holy Cross College in 1981. He was reassigned in 1989 or 1990 to Criminal Investigations, Rape Division. In 1989, in addition to his job as a police officer, he became Chief of Security at Xavier. He retired from the New Orleans Police Department in 1994.
Officer Williams recalled that the robber entered with his gun in plain view and immediately ordered everyone to put everything on the tables. As soon as the gunman turned and began walking towards him, he thought his identity as a Upoliceman would be discovered. He was concerned that this would result in a confrontation in which everyone’s lives would be threatened. Therefore, as he watched the robber approach, he put his wallet, containing his badge and ID card, beside him on the wooden booth. Instead of continuing toward Officer Williams, the robber turned to go behind the counter where the corner of a wall temporarily blocked his line of vision to the officer.
According to Officer Williams, Mr. Yerks and Ms. Mack were sitting on the stools at the end of the counter closest to him, which put them between his position in the booth and the location of the cash register.[2] Officer Williams testified that he had considered remaining in the booth, but decided against doing so when the robber began hurrying Ms. Brown to open the register. Because of the robber’s tone of voice and manner of brandishing the gun as well as the position of the other two customers, the officer decided *523 to move while the robber could not see him. Officer Williams drew his gun and got up from the booth, edging against a wall that paralleled the line of the counter and ended at the two-foot aisle where the robber had toned.
Officer Williams testified that he considered everyone’s fives to be in imminent danger once the robber went behind the counter with his gun drawn. He admitted that there had been no express threat of harm to anyone at the time he left the booth. However, in his view the gunman’s evident intent to rob each of the customers, rather than just emptying the register, represented a direct threat of harm. Officer Williams also realized that Ms. Mack and Mr. Yerks were between |5him and the gunman. Once he began moving towards the counter, the officer detected increasing frustration in the robber’s orders to Ms. Brown to get the register open. Officer Williams was aware that he was unable to call for assistance from other officers, and he was also aware that he did not know whether the gunman had an accomplice nearby. He nevertheless decided to act, not only out of concern for what could happen if his identity were discovered, but because, as he told the court, the gunman’s “mere presence with a revolver, his verbiage, his orders, it did tell me one thing. In my training as a policeman he was not there just to get any contributions; his mere verbiage, his orders threatened lives.” Therefore, by the time he reached the corner of the wall near the counter, Officer Williams had decided to shoot the gunman if the opportunity arose.
By the time Officer Williams was able to peer around the corner of the wall, the robber was standing with his back to him, slightly to the right of Ms. Brown (her left, as she faced the cash register). He testified that the robber had his large caliber gun at Ms. Brown’s head, threatening to “blow it off” if she did not get the register open more quickly. The policeman moved out from the wall, brought his gun up and adopted a firing stance. He explained that he was somewhat sheltered behind the corner of the counter; He made eye contact, briefly, with Ms. Brown as she emptied the register’s contents into a bag. With his left hand, he signaled for her to get down. Ms. Brown had glanced at Officer Williams two or three times when the gunman suddenly looked around and saw him near the end of the counter. The robber then turned and began bringing his gun to bear on the officer.
Officer Williams remembered shooting almost simultaneously with the robber. Because he was moving, trying to regain cover, the officer could not say |6who got off the first shot. He did recall having deliberately fired high and to the right of the gunman because of Ms. Brown’s position and because he was moving. Officer Williams acknowledged being taught never to fire warning shots, never to assume an officer’s weapon would cause an armed robber to surrender his gun, and that regardless of his intent, he was responsible for each bullet he fired. He explained, however, that he did not consider his initial shots to be a warning, but rather the best thing he could do to regain cover without firing in Ms. Brown’s direction. The officer stated that he had hoped the gunman would surrender if taken off guard; he did not, however, assume that his actions would yield that result. Officer Williams testified that he believed he had responded appropriately and to the best of his abilities.
After firing two shots from the corner of the wall, the policeman quickly ducked below the end of the counter and peered around to the back of it. Ms. Brown was lying on the floor, but he could not tell if she was injured. The robber was crouched down slightly past her, apparently trying to get into a crawl space. Officer Williams fired again, above Ms. Brown, then ran back around to the front of the counter where it seemed the robber was heading. He peered over the counter, saw the gunman still trying to get into the crawl space, and fired his gun once more. His gun only clicked, and he realized he was out of ammunition.
In an instant, Officer Williams decided to get his shotgun from the trunk of his car, and he dashed through the double set of glass doors. The robber fired at him again, shattering glass all around him. The policeman realized he was wounded in the head, wrist and leg, but did not know whether he *524 had been struck by a bullet or by broken glass. After retrieving his shotgun, Officer Williams passed Ms. Mack in the parking area before he cautiously re-entered the 17restaurant. The gunman was no longer in the building, but Ms. Brown lay bleeding and unconscious on the floor behind the counter.
Other officers, responding to Mr. Yerks’ phone call, arrived shortly after Officer Williams re-entered the restaurant. Joyce Brown was taken to Charity Hospital for emergency treatment. It was determined that a bullet had passed through both bones of her right forearm, shattering them, then apparently struck the crown of her head, without penetrating the skull. The bullet, however, drove small shards of bone and bullet fragments into the surface of the brain. A blood clot at the site of this impact resulted in permanent brain damage, causing both mental and physical impairments. Ms. Brown has been interdicted, and generally requires twenty-four hour assistance in all daily activities.
This suit was filed, asserting that Officer Williams’ unreasonable conduct had caused Ms. Brown’s injuries, either directly, because he missed the robber and shot her, or indirectly, because he instigated the shoot-out.[3] The suit also asserted that the City was vicariously liable for the officer’s actions and primarily liable for its failure to properly train the officer as well as its failure to enforce its policies governing the use of deadly force. Expert testimony in those areas, in addition to the fact witnesses whose testimony is detailed above, was presente^ at a three-day bench trial in October 1995.
On November 27, 1995, the trial court rendered judgment in favor of the defendants and dismissed all claims. In written reasons for judgment, the court stated that the plaintiff had failed to show that Officer Williams’ actions were |8unreasonable under the circumstances, as required under Mathieu v. Imperial Toy Corporation, 94-0952 (La.11/30/94), 646 So.2d 318. In addition, the court rejected the contention that alleged deficiencies in Officer Williams’ training contributed to Ms. Brown’s injury. This appeal followed.
DISCUSSION
The plaintiff first asserts that the trial court committed legal error because it applied the “reasonableness” standard set forth in Mathieu to the facts of this case, and that this court is required to review the case de novo. Plaintiff contends that liability must be found to exist here because Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), establishes that “[a] police officer who instigates a gun battle in a crowded restaurant is responsible for all of the injuries caused by that negligent act.”
Plaintiffs primary argument in this regard involves distinguishing Mathieu, which considered a police officer’s legal duty in approaching an armed suspect, from Pizza Hut and many other cases involving an officer’s duty to protect innocent bystanders from gunfire. This argument presumes that because the trial court referenced the Mathieu case, its decision was based upon a blind application of the factors enumerated therein, without consideration of Officer Williams’ duty to the innocent bystanders, Ms. Brown and the two customers. We find no basis for this presumption. The trial court’s written reasons reflect consideration of the specific circumstances presented here, as well as the expert opinions that were expressly based upon these particular facts. Although there is no discussion of the individual elements of the duty-risk analysis in the reasons for judgment, the court implicitly found that Officer Williams owed a duty to Ms. Brown to act reasonably under the totality of the circumstances, but that this duty was not breached.
^Furthermore, contrary to plaintiffs assertion, Pizza Hut announced no per se rule of liability. Liability for “instigating” gunfire is mentioned in that case only in the context of discussing whether the jury could have *525 found that the security guard shot first. See 455 So.2d at 1370. Because the evidence preponderated against that finding, this discussion is dicta.
Mathieu is not inconsistent with Pizza Hut nor does it represent a change in the law. In Pizza Hut, expert testimony concerning a security guard’s duties was found to establish, among other things, that it was unreasonable for an officer to make a sudden movement when the robber’s shotgun was pointed at him and he had been ordered to keep still. More recently, the Mathieu court reiterated that an officer’s course of conduct need only be reasonable, not ideal, and thus found no liability for two officers’ decision to approach an apparently armed man without waiting for backup. In each case, the Supreme Court applied the duty-risk analysis to the particular facts in order to determine whether liability would be imposed based upon an officer’s conduct.
Here, as in Mathieu, the conduct at issue is the officer’s decision to act and his method of approaching an armed individual. The trial court correctly measured the officer’s conduct against the Mathieu standard of “reasonableness under the totality of the circumstances.” Accordingly, this Court cannot reverse the judgment below absent a manifest error of material fact or reversible error of law made in the trial court. Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 4 (La.2/20/95), 650 So.2d 742, 745.
Plaintiff next contends that the trial court erred in disregarding the testimony of Alex Vega, her ballistics expert. Mr. Vega offered the opinion that Ms. Brown was hit by one of Officer Williams’ initial shots, possibly as it ricocheted off a | ^cabinet behind the register.[4] The court rejected Mr. Vega’s opinion as being based upon an inadequate foundation, a conclusion the plaintiff contests. Similarly, plaintiff asserts that the court erred when it disregarded Mr. Yerks’ testimony regarding who fired first. The court indicated that it did not find Mr. Yerks credible because he was an inmate in a state prison at the time of trial. Plaintiff correctly notes that no evidence to that effect was admitted at trial.[5]
We find that, under the circumstances presented, it is not necessary to determine who fired first or whose bullet struck and injured Ms. Brown. As demonstrated in Harris v. Pizza Hut, an officer and his employer are not absolved of liability by a showing that a robber, rather than the police, fired first and injured a bystander. Conversely, the fact that an innocent bystander is directly injured by an officer’s conduct does not, in and of itself, render the officer liable in tort. Gordon v. City of New Orleans, 363 So.2d 235 (La.App. 4th Cir.1978), aff'd per curiam, 371 So.2d 768 (La.1979); Mahl v. Himel, 93-856 (La.App. 5th Cir. 6/28/95), 657 So.2d 1386, writ denied, 95-1954 (La.11/13/95), 662 So.2d 472. Instead, as the trial court did here, the specific factual situation must be considered to determine whether unreasonable conduct by the officer was the legal cause of the bystander’s injury.
Both plaintiff and the defendants presented testimony by experts in police policy, procedures and training to address the issue of the reasonableness of Officer Williams’ actions. The plaintiff called George J. Arm-bruster, Jr., Chief Inof Staff and Warden with the Lafayette Parish Sheriffs Office, and Professor Larry A. Gould. Both of these experts had experience as law enforcement officers and have served as instructors for various police forces in this state. Similarly, Lieutenant Kerry J. Najolia of the Jefferson Parish Sheriffs Office, who was accepted as an expert for the defense, served as a patrol officer before becoming the second-in-command at Jefferson Parish’s training academy. While the extent and nature of the experts’ involvement in law enforcement *526 varied somewhat, all three have taught in police academies on the use of deadly force and have participated-as both students and instructors in “shoot/don’t shoot” training courses.
Both of plaintiffs experts opined that Officer Williams reacted “emotionally” or “in panic” that night. Both also agreed that offering resistance to an armed robber statistically increases the likelihood of harm. For this reason both felt that Officer Williams should have remained in the booth, and waited to see if any actual physical threat were made against the waitress or the customers before taking any direct action. Chief Arm-bruster stated that the officer’s decision to move closer to the others in the restaurant was unreasonable since it escalated the threat to the robber even though he had made no audible threat of violence. Professor Gould found Officer Williams’ moving closer to the counter to be inappropriate because it increased the risk to the three bystanders without giving the officer any greater vantage point or position of control.
Chief Armbruster and Professor Gould also found that Officer Williams violated good police practice as well as N.O.P.D. policy when he fired “warning shots” away from the perpetrator, instead of shooting at “center mass” to kill. These experts agreed that Officer Williams was legally justified in shooting oncejjhe was faced with the robber’s gun. Despite this, they felt that it was unreasonable for him to do so because of Ms. Brown’s proximity to the robber and the nearness of the two customers. They opined that, under these circumstances, the risk of the bystanders being hit by a shot or ricochet from Officer Williams’ gun presented a greater threat to these bystanders than did the gunman. In addition, Chief Armbruster found the officer’s decision to return fire at all was unreasonable. He based this opinion upon Officer Williams’ low scores on the firing range that, although passing for certification purposes, showed that he was a poor marksman.
In the view of these experts, this shoot-out could have been avoided entirely if Officer Williams had disposed of his wallet, had his gun ready but hidden, then had waited to see if intervention became necessary. In their opinion, the officer’s position in the booth would have given him a better observation point from which to assess the gunman’s actions. It also would have forced the robber to come to him, in the open and away from the bystanders. Both felt that Officer Williams acted unreasonably by approaching the robber before any real necessity existed. He then compounded his error by firing wildly, with no intent to eliminate the perceived threat posed by the gunman. They testified that an officer is required to use gunfire only as a last resort when innocent bystanders are involved. In their opinion, Officer Williams improperly instigated a gun battle, and then failed to use deadly force when he should have.
In contrast, Lieutenant Najolia, the defense expert, testified that Officer Williams’ decision to move from the booth while the robber’s view of him was temporarily blocked was sound. He based this opinion on the fact that the booth was in a confined area and upon the positions of the two customers at the counter. |13Even though the gunman had not yet made a verbal threat of violence, this expert found that the officer’s perception of peril, which was based solely on the robber’s conduct and demeanor, was reasonable. As Lieutenant Najolia explained, these two factors are those upon which an officer frequently must rely in making a quick decision. He noted that although Officer Williams’ new position at the comer of the wall placed him closer to the “kill zone,” somewhat increasing the risk that gunfire would be necessary, the action also removed the two customers from his line of fire and permitted him to observe the gunman’s actions more closely. For these reasons, Lieutenant Najolia found that the officer’s movement was tactically sound and in accord with good police practice.
Although Lieutenant Najolia agreed with the plaintiffs experts that an officer should shoot to kill if he is going to fire his weapon, especially if innocent bystanders are present, he explained that this rule is not absolute. He did not find Officer Williams’ initial shots unreasonable under the circumstances presented here. Instead, he found that firing away from the robber and the cashier ap *527 peared to have given both the two customers and the police officer the opportunity to seek cover from the gunman’s shots while lessening the risk of a direct hit into Ms. Brown. He opined that the officer could reasonably have believed that the waitress, having seen his signals to get down, also would have had an opportunity to obtain safety on the floor. With the limited options available to Officer Williams in the face of the robber’s apparent readiness to fire, Lieutenant Najolia did not consider either the decision to return fire or to direct it upwards to be unreasonable.
Plaintiff contends that the trial court erred in accepting Lieutenant Najolia’s opinion rather than the opinions offered by her experts. Having read the entire | ^record, however, we do not find any merit to plaintiffs challenges regarding the Lieutenant’s qualifications or alleged bias. Instead, the record reflects that the trial court was presented with a straightforward conflict of expert opinions. While Professor Gould termed Officer Williams’ actions “inappropriate” and Chief Armbruster labelled them “unreasonable,” Lieutenant Najolia applied virtually the same standards of police conduct to the same facts and, for reasons based upon his training and experience, found the officer to have responded reasonably under the circumstances. Because the trier of fact is responsible for determining which view is more credible, the trial court’s reliance upon the latter opinion is neither manifestly erroneous nor an abuse of discretion. Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 5 (La.1/29/96), 666 So.2d 1073, 1077; J.A.G. v. Schmaltz, 95-2755, p. 12 (La.App. 4th Cir. 10/23/96), 682 So.2d 331, 337, writ denied, 96-3074 (La.2/7/97), 688 So.2d 505.
The plaintiff next argues that liability was established because, under statewide standards for law enforcement officers, Officer Williams was not qualified to carry a gun at the time of this incident.[6] These standards, established pursuant to La. R.S. 40:2401-06, require that every officer renew his firearms qualifications “a minimum of one (1) time per year” or lose his certification. Officer Williams had last qualified on October 29, 1986 (thirteen months earlier) with the gun used the night of the robbery, and in 1985 with his service revolver. Because of this, plaintiff argues that both defendants breached their duty to maintain the officer’s weapons qualifications, and that “but for” this breach Ms. Brown would not have been injured.
| isWe find no error in the trial court’s rejection of this argument. Although all three experts agreed that an officer should be requalified every twelve months, there was absolutely no testimony or other evidence of any requirement that the employing department must confiscate the officer’s gun, or that the officer forego its use, when that period had elapsed. Absent such a duty, liability cannot be established based upon Officer Williams’ technical lack of certification. See, e.g., Roberts v. Benoit, 605 So.2d 1032, 1050 (La.1992), on rehearing.
Finally, we cannot say that the trial court erred in determining that plaintiff failed to prove the City liable for a failure to properly train Officer Williams. Chief Arm-bruster and Professor Gould testified that police standards require annual field and classroom retraining on the use of deadly force,[7] and that according to an “Education and Training” sheet from his personnel file Officer Williams had not been retrained. However, we cannot necessarily draw that conclusion from the document. The personnel sheet contains very little information. It shows only the officer’s name, social security number, his dates and scores for weapons qualifications in 1983 and 1984, and one other course in 1983. The rest of the document is left blank, including sections concerning the officer’s educational level and academy attendance. This suggests that this record is not complete and that other omissions could exist. Officer Williams testified, without *528 challenge, that he had annual retraining, as required. Based on this evidence, the trial court reasonably could conclude that the opinions as to inadequate training were without an evidentiary foundation. We find no error in the court’s rejection of this theory of liability.
| mFor these reasons, we affirm the trial court’s judgment dismissing plaintiffs claims against Reginald Williams and the City of New Orleans.
AFFIRMED.
JONES, J., dissents.

. Although Reginald Williams is no longer with the police department, we have referred to him as Officer Williams in this opinion.

. This testimony conflicted with that of Mr. Yerks, who had testified that he and Ms. Mack were sitting in the center of the counter, near the cash register and in front of the door, as he ate a bowl of grits. Exhibits P-3 and P-7, police photos of the scene, show a bowl of grits, silverware, napkins, etc., at the end of the counter, which would be consistent with Mr. Yerks’ position as described by Officer Williams.

. Suit was also filed against Ms. Brown's employer and its insurers, but those claims were dismissed on summary judgment because worker's compensation was found to be her exclusive remedy. Brown v. Diversified Hospitality Group, Inc., 600 So.2d 902 (La.App. 4th Cir.1992). The compensation insurer, Hartford Casualty Insurance Company, intervened to recover amounts paid as a result of Ms. Brown's injuries, stipulated to total $758,471.76 as of July 27, 1995.

. The evidence on this point was equivocal. No identifiable bullet fragment was removed from Ms. Brown. However, one bullet that was not from Officer Williams’ gun (this bullet was solid lead while Officer Williams’ used copper-jacketed bullets) had blood and tissue on it.

. Although it is now argued that the district court’s reason for rejecting Mr. Yerks' testimony was unsound, we note that neither the experts nor Officer Williams was questioned at trial concerning Yerks’ version of events, suggesting that little credence was given to the theory that the officer had no reason to fire when he did.

. We need not address plaintiff’s related argument that liability was established because Officer Williams was a poor marksman. It was undisputed that police standards at the time required a score of 75% or higher, and that this officer’s qualifying score was 79%.

. While their testimony suggests that current standards include a requirement for active “shoot/don't shoot” training, there was no evidence that such was required in 1987.