844 So.2d 304 (2003)
Della McINTYRE
v.
THE ST. TAMMANY PARISH SHERIFF, Jack Strain, and the St. Tammany Parish Sheriff's Department and St. Tammany Parish Deputies X, Y and Z, and XYZ Insurance Company, and the Town of Abita Springs and Abita Springs Deputies Roby Rogers and Deputy X, and ABC Insurance Company and the State of Louisiana, Department of Corrections, Probation Services, and Probation Officer, Lauren McElveen, and Rene C. Duffourc, III, M.D.
No. 2002 CA 0700.
Court of Appeal of Louisiana, First Circuit.
March 28, 2003.
*305 Delbert G. Talley, Covington, for Plaintiff-Appellant, Della McIntyre.
Marjorie G. O'Connor, Assistant Attorney General, Baton Rouge, for Defendants-Appellees, Lauren McElveen and the State of Louisiana, Through the Department of Public Safety and Corrections.
Alan D. Ezkovich, Lisa A. Valley, New Orleans, for Defendant, The Town of Abita Springs.
Before: CARTER, C.J., WHIPPLE, and CIACCIO,[1] JJ.
*306 CARTER, C.J.
This appeal arises out of a negligence action brought by Della McIntyre (plaintiff) against probation officer Lauren McElveen (McElveen) and the State of Louisiana, through the Department of Public Safety and Corrections (DPS).[2] The action stems from the murder of plaintiff's two children by her ex-husband and probationer, Talmadge "Tommy" McIntyre (McIntyre). The trial court granted a motion for summary judgment in favor of McElveen and DPS, dismissing them from the lawsuit. In oral reasons assigned, the trial court explained that "McElveen's alleged breach of duty" did not cause the death of plaintiff's children. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
The facts are undisputed and are taken from plaintiff's and McElveen's deposition testimony. The plaintiff and McIntyre were divorced in January 1998. The final divorce decree provided for joint custody of the couple's two children, with McIntyre having visitation rights, and the plaintiff designated as the domiciliary parent. A few months after the divorce, the plaintiff obtained a restraining order against McIntyre prohibiting contact with her and the children.[3] Plaintiff explained that she sought the restraining order against her ex-husband "because he was drinking" and "acting crazy," she did not want him around her or the children, and her "son did not want to really be around him." She also explained that she was concerned about McIntyre neglecting the children and mentally abusing them, but was not concerned about physical harm or abuse.
Despite the restraining order, McIntyre subsequently had contact with the children on a few occasions. The plaintiff never reported the violations of the restraining order to the court nor sought to have the custody/visitation order modified by the court. Plaintiff did, however, report the restraining order violations to several law enforcement officers. She also attempted to contact her ex-husband's probation officer, McElveen, on several occasions to advise him that McIntyre was violating the conditions of his probation by drinking, using drugs, violating the restraining order she had against him, and possessing a gun.[4] The plaintiff was unsuccessful each time she attempted to telephone McElveen. She left a voice message with her name and telephone number each time she called, but she did not leave any messages with specific information regarding her ex-husband's activities or why she was calling. The last time the plaintiff attempted to *307 contact McElveen was about one month before her ex-husband shot and killed her children. McElveen never returned the plaintiff's phone calls.
McElveen testified at his deposition that he supervised around one hundred probation cases even though he was only supposed to handle fifty cases. He took over the supervision of McIntyre's probation and later met McIntyre for the first time in May 1998 when McIntyre was in court for an unrelated traffic violation. McIntyre told him at that initial meeting that he was having trouble visiting his children, because any time he was around them a charge would be filed against him. McElveen advised McIntyre to stay away from his ex-wife as much as possible. McElveen acknowledged that a note dated April 22, 1998, was in McIntyre's file regarding a phone call from McIntyre to the probation office conveying that his ex-wife had filed stalking charges against him and that the sheriff's office was looking for him. At that time, McIntyre was advised (by McElveen's supervisor) to stay away from his ex-wife and that the probation office would look into the matter. McElveen's next notation in McIntyre's probation file was regarding McIntyre's arrest for first offense DWI on June 10, 1998. He also noted in the file the fact that McIntyre was not placed in jail for the DWI arrest. McElveen testified that he was required to prepare a written report advising the judge who had placed McIntyre on probation about the DWI arrest. However, McElveen did not write the report before McIntyre shot and killed his children on July 13, 1998.
On July 10, 1998, McElveen finally spoke to McIntyre on the telephone after several days of each one leaving messages for the other. McElveen informed McIntyre that he was not turning in his monthly reports or paying his fees as required by the conditions of his probation. McIntyre told McElveen that he felt that his ex-wife had set him up for the DWI arrest because she knew he had been drinking at a certain bar, and she had probably tipped off the state police. McElveen testified that McIntyre never made any threats against his ex-wife or his children, and McElveen advised McIntyre to stay away from his ex-wife and to stay out of trouble.
On July 12, 1998, the plaintiff agreed to McIntyre's request to let the children spend the night at his house. The plaintiff was working that night, and she testified that she had no reason, other than the restraining order, to prohibit the children from staying with McIntyre. The plaintiff stated that her ex-husband had never before threatened to harm the children, and she did not believe that he would ever hurt the children. McIntyre telephoned the plaintiff at her place of employment around 11:00 p.m. to request that she stop by his house to pick up her daughter. The plaintiff took her mother with her when she went to McIntyre's house. When she arrived, the plaintiff testified that her daughter was asleep so she did not wake her. She also testified that her son asked her twice if he could come home. However, even though her son seemed "distraught," he was not hurt, so the plaintiff left her son with his father. The plaintiff stated that McIntyre seemed angry that her mother had come along with her, but that he was not acting unusual. The plaintiff did not feel it was necessary to call the police for any reason at that time.
The plaintiff left McIntyre's house and went home to bed. She was awakened around 2:00 a.m. (on July 13th) by a telephone call from McIntyre. McIntyre told the plaintiff that he was going to kill the children. The plaintiff hung up, immediately called 911, and then called her mother who lived next door. The police arrived *308 at the plaintiff's home and because McIntyre did not have a telephone at his house, everyone began the process of quickly trying to determine the location from where the call originated. McIntyre called several times during this time period. The plaintiff repeatedly asked her ex-husband where he was located, and she begged him not to hurt the children. McIntyre shot and killed the children while on the telephone with the plaintiff's mother. The police eventually apprehended McIntyre and located the children's bodies at his sister's house, about fifteen minutes away from his house.
In her lawsuit, the plaintiff alleged that she suffered the loss of her children and severe emotional and physical trauma due to the negligence of McElveen and DPS in failing to properly supervise McIntyre on probation.[5] McElveen and DPS filed two different peremptory exceptions raising the objection of no cause of action, contending that they owed no duty to plaintiff. The exceptions were denied both times by the district court. This court and the supreme court both denied writs of review. The parties proceeded with discovery. McElveen and DPS then filed a motion for summary judgment contending that the pleadings and depositions of the plaintiff and McElveen revealed that there was no duty owed to the plaintiff and that DPS and McElveen were entitled to judgment as a matter of law on the issue of liability. After a hearing, the trial court granted the motion for summary judgment and dismissed the plaintiff's case against DPS and McElveen. The plaintiff appeals, arguing that there are genuine issues of material fact as to the existence of and scope of the duty owed by McElveen and DPS to the plaintiff, as well as the bad faith of McElveen and DPS.

LAW AND ARGUMENT
Law of the Case Doctrine
Initially, we reject the plaintiff's assertion that the law of the case doctrine precludes DPS and McElveen from raising the same issues in their motion for summary judgment as were denied in their prior peremptory exceptions raising the objection of no cause of action. The trial court's ruling on the objection of no cause of action was an interlocutory judgment. LSA-C.C.P. art. 1841. DPS and McElveen may re-urge their arguments regarding the lack of a duty owed to the plaintiff subsequent to the denial of their peremptory exceptions. Likewise, the denial of a writ application for supervisory review of an interlocutory judgment does not bar reconsideration of, or a different conclusion on, the same question when an appeal is taken from a final judgment. Dupre v. Maynard, 96-1183, p. 3 (La.App. 1 Cir. 3/27/97), 692 So.2d 36, 38, writ denied, 97-1508 (La.9/26/97), 701 So.2d 986. Furthermore, the standard of review for a motion for summary judgment allows review of the evidence submitted in support of the motion in addition to the pleadings, whereas no evidence may be introduced at any time to support the objection that the petition fails to state a cause of action. See LSA-C.C.P. arts. 931 & 966. Thus, we find no merit to plaintiff's argument that the law of the case doctrine should be applied in this case.
Summary Judgment
Appellate courts review summary judgments de novo under the same criteria *309 that govern the trial court's consideration of whether a summary judgment is appropriate. J. Ray McDermott, Inc. v. Morrison, 96-2337, p. 9 (La.App. 1 Cir. 11/7/97), 705 So.2d 195, 202, writs denied, 97-3055, 709 So.2d 753, 97-3062 (La.2/13/98), 709 So.2d 753, 754. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions. The procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966(A)(2). A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
The initial burden of proof is on the mover to show that no genuine issue of material fact exists. LSA-C.C.P. art. 966(C)(2). However, once the mover has made a prima facie showing that the motion should be granted, if the non-mover bears the burden of proof at trial on the issue before the court, the burden shifts to him to present evidence demonstrating that material factual issues remain. LSA-C.C.P. art. 966(C)(2); Paul v. Louisiana State Employees' Group Benefit Program, 99-0897, p. 5 (La.App. 1 Cir. 5/12/00), 762 So.2d 136, 140. A court may grant summary judgment that is dispositive of a particular issue, theory of recovery, cause of action or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case. LSA-C.C.P. art. 966(E). The mover for summary judgment need not negate all essential elements of the adverse party's claim; he must simply show an absence of factual support for one or more elements essential to the adverse party's claim. LSA-C.C.P. art. 966(C)(2).
Duty-Risk Analysis
Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty-risk analysis.[6] Under this analysis, a determination of liability requires proof of five separate elements, all of which must be answered affirmatively for the plaintiff to recover: (1) proof that the defendant had a duty to conform his conduct to a specific standard of care (the duty element); (2) proof that the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). See Mathieu v. Imperial Toy Corp., 94-0952, pp. 4-5 (La. 11/30/94), 646 So.2d 318, 322. A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Id. at 326. Accordingly, because we find that the scope of liability element is missing in this case, we need not examine the other duty-risk inquiries.
We find that the senseless and tragic murder of plaintiff's children by her ex-husband/probationer was a completely unforeseeable occurrence and not the result of any act or failure to act on the part of McElveen or the DPS. Plaintiff testified in her deposition that she had no indication that her ex-husband was going to harm her children. We cannot say that any action on the part of McElveen could have *310 prevented McIntyre from shooting and killing his children. The record does not reveal any reason for McElveen to have foreseen the murders. Even if we assume that McElveen breached his duty to supervise McIntyre on probation, we do not believe that a sufficient connection has been established between McElveen's alleged breach of duty and the murder of the plaintiff's children. A plaintiff's case must fail if the evidence shows only a possibility of a causative connection or leaves it to speculation or conjecture. See Todd v. State, through Dept. of Social Services, 96-3090, p. 16 (La.9/9/97), 699 So.2d 35, 44.
The duty of a probation officer to supervise the activities of a probationer does not include the obligation to take charge of or have custody of the probationer. Within the limits of the conditions of his probation, the probationer is free to come and go as he pleases, when and where he pleases. It is not the probation officer's duty to follow each probationer to prevent him from harming others. Probation officers are not the guarantors or insurers of the safety of each and every person probationers may come into contact with. The purpose of probation is to serve the public by rehabilitating convicted criminals and returning them to productive positions in society. Successful probation requires assisting a probationer in making his own decisions and allowing some freedom of action. Each person who chances to come into contact with a probationer bears the risk that the rehabilitative effort will fail. See Martinez v. California, 444 U.S. 277, 281-283, 100 S.Ct. 553, 557-558, 62 L.Ed.2d 481 (1980).
In the case sub judice, even if McElveen had taken the necessary steps to notify the judge who placed McIntyre on probation that McIntyre had or was about to violate the conditions of his probation, there is no evidence that McIntyre would have been imprisoned or had his probation revoked on the date that he decided to take the lives of his children. Likewise, even if McElveen had exercised his discretion, pursuant to LSA-C.Cr.P. art. 899, to investigate and then to arrest McIntyre because he reasonably believed that McIntyre was about to violate a condition of his probation, there is no evidence that McIntyre would have been imprisoned after the arrest.[7] After the arrest, McIntyre may have been able to post bail and obtain his freedom. See LSA-C.Cr.P. art. 899(C). McElveen would not have been involved again until possibly testifying at McIntyre's revocation hearing. See LSA-C.Cr.P. art. 900, et seq. Not every probation violation will result in imprisonment or a revocation of probation. The trial judge has wide discretion when a condition of probation is violated. See LSA-C.Cr.P. art. 900. Thus, it is evident that regardless of McElveen's and DPS's alleged breaches of duty, McIntyre may have still been free to persuade his ex-wife to allow him to see his children and then make the decision to murder them on the night they were in his custody. The arrest of McIntyre or the notification to the court of a possible probation violation would not have prevented McIntyre from harming his children. To find otherwise would be pure speculation on our part.
A probation officer only has very limited control over a probationer who is free on probation. A probation officer who *311 does not have the ability to control a probationer's activities or his whereabouts twenty-four hours a day should not have liability imposed for the unanticipated criminal acts of the probationer. See Hartford Fire Ins. Co. v. State Dept. of Health & Human Resources, 413 So.2d 1360, 1361 (La.App. 1 Cir.1982). We find as a matter of law that the duty of a probation officer to assure the probationer's compliance with the terms of his probation does not include the duty to protect the plaintiff from the harm caused here when her ex-husband/probationer murdered her children.[8] This tragic incident was so unforeseeable and unpredictable that not even the plaintiff, who knew her ex-husband so well, envisioned or anticipated that it would occur. We cannot impose liability on the probation officer or the state under these circumstances.

CONCLUSION
For the above reasons, the judgment of the trial court dismissing plaintiff's claims against the probation officer, Lauren McElveen, and his employer, the State of Louisiana, through the Department of Public Safety and Corrections, is affirmed. Costs are assessed to the plaintiff-appellant, Della McIntyre.
AFFIRMED.
NOTES
[1] Hon. Philip C. Ciaccio, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Plaintiff also named various law enforcement agencies and officers and a doctor as defendants; however, the motion for summary judgment on appeal pertains only to McElveen and DPS. Lauren McElveen's name is spelled differently throughout the record. For consistency, we will use the spelling as it appears in the petition.
[3] Although the restraining order, divorce decree and custody/visitation orders are not in the record, DPS and McElveen do not dispute the facts surrounding these documents as described by plaintiff in her deposition testimony.
[4] There is no evidence in the record regarding the details of McIntyre's conviction, sentence or probation other than McElveen's deposition testimony that he thought McIntyre had been convicted of aggravated battery, that his sentence had been suspended, and that he had been placed on probation. The plaintiff testified in her deposition that she had never met her ex-husband's probation officer and that she knew of McElveen's name only because her ex-husband told her. The plaintiff also testified that she never saw a gun in McIntyre's possession or at his house, but he told her that he had a gun. McIntyre never threatened plaintiff or the children with the gun.
[5] The allegations against DPS involved negligent training and supervision of McElveen. The lawsuit also contained numerous other allegations of negligence against other law enforcement agencies, officers and a doctor that are not at issue in this appeal.
[6] Since neither party has raised immunity, we will decide the duty issue under the traditional duty-risk analysis. See Persilver v. Louisiana Dept. of Transp., 592 So.2d 1344, 1347 n. 2 (La.App. 1 Cir.1991).
[7] We note that McElveen's knowledge of McIntyre's arrest for first-offense DWI was not the equivalent of knowledge that McIntyre had engaged in criminal activity in violation of his probation. An arrest is not a conviction and is therefore not sufficient to establish a probation violation. State v. Sussmann, 374 So.2d 1256, 1257 n. 1 (La.1979).
[8] In light of our holding, we pretermit discussion of the alleged bad faith of McElveen and DPS.