646 So.2d 318 (1994)
Gerard A. MATHIEU, et al.
v.
IMPERIAL TOY CORPORATION, et al.
No. 94-C-0952.
Supreme Court of Louisiana.
November 30, 1994.
Rehearing Denied January 26, 1995.
*319 Stephen H. Shapiro, George A. Blair, III, Avis M. Russell, Terri F. Love, Bruce G. Whittaker, Michael Riehlmann, New Orleans, and Franz L. Zibilich, Metairie, for applicant.
Rodney G. Cater and Jennifer Willis, Cater & Willis; and William P. Quigley, New Orleans, for respondent.
Gerald J. Nielsen, Metairie, for Louisiana Mun. Ass'n, Louisiana Ass'n of Chief of Police, amicus curiae.
Thomas A. Usry, Metairie, for Louisiana Sheriffs Ass'n and Louisiana Sheriff Risk Management, amici curiae.
KIMBALL, Justice.[*]

FACTS
On the night of May 16, 1988, the New Orleans Police Department was notified that *320 a suspicious person with a gun had been seen near the Lafon Nursing Home, just off St. Bernard Avenue, between Senate and Caton Streets in New Orleans. A patrol car was dispatched to investigate, but when the responding officers arrived, they advised the dispatcher that the subject was not in the area.
A short time later, the police department was notified again that a suspicious person with a gun was peering into windows at the nursing home. New Orleans police officers Armando Asaro and Gary Guggenheim, who were travelling along St. Bernard Avenue approximately two to three blocks away from the scene at the time of the call, responded. When these two officers, who were five and seven year veterans of the New Orleans Police Department, arrived on the scene, they parked their patrol car on Senate Street near a side entrance to the nursing home, just past the driveway to the nursing home's parking lot. They were met there by a security guard and a nursing assistant. The security guard told the officers that the man who had given rise to the call was lying asleep in the grass just outside the parking lot behind the building, about forty (40) or fifty (50) feet away.
Based on this information, the officers decided to approach the man quietly by proceeding through the parking lot.[1] The officers testified at trial that from their years of working in the area they were aware of the fact that children were frequently in the area. As such, the officers testified that they intended to disarm the subject while he was lying asleep on the grass. Officer Asaro also testified that the area of the city where this incident occurred is a high crime area, frequented by drug addicts, and that he was fearful the subject might be intoxicated or on drugs. The officers further testified that disarming individuals is a routine practice for members of the New Orleans Police Department, and that they thought it would be particularly easy to disarm this subject because they believed he was either asleep or intoxicated.
When Officer Guggenheim was about twenty feet away from the subject, he saw the gun in the subject's hand and drew his service revolver. When he was four to six feet away, the subject lifted his head and pointed the gun that he was holding in his right hand at Officer Guggenheim, prompting Officer Guggenheim to fire. After firing three or four shots, Officer Guggenheim paused, because he thought the subject was going to drop the gun, but he quickly resumed firing once he realized that the subject was still pointing the gun at him and moving.
In the meantime, Officer Asaro was about twenty feet behind his partner. He saw the subject bring his hand up, lift his head, and point the gun at Officer Guggenheim. Officer Asaro could not respond because his partner was in his line of fire. After Officer Guggenheim fired six rounds, he dropped to the ground to reload and rolled to the side. The subject then rose and pointed the gun at Officer Asaro. Officer Asaro fired three times, and the subject fell backward. Two bullets from Officer Asaro's weapon struck the subject.[2] Officer Asaro testified that the entire episode, from the moment the subject raised his hand to point his gun at Officer Guggenheim until he was shot by Officer Asaro, lasted for only a "split second."
After the shooting, the officers approached the subject, and Officer Guggenheim stepped on the subject's hand to take his gun away. The gun was crushed under Officer Guggenheim's foot because it was a plastic toy. The officers later learned that the subject, Gerard A. Mathieu, was a delusional and paranoid schizophrenic, who, as his psychiatrist later *321 testified, had not been taking his medication at the time of the shooting and was detached from reality.

PROCEDURAL HISTORY
Plaintiffs, Gerard A. Mathieu and Roxie Mathieu, suing on her own behalf and on behalf of her minor daughter Areatha Mathieu, filed suit against the City of New Orleans, Officers Gary Guggenheim and Armando Asaro, Superintendent Warren Woodfork of the New Orleans Police Department, K-Mart Corporation, Imperial Toy Company, Inc., and their insurers.
After all defendants other than the City of New Orleans had either been dismissed from the suit or settled with plaintiffs, the matter proceeded to trial against the City of New Orleans in Civil District Court for the Parish of Orleans.[3] The trial court found that the manner in which the two police officers approached Mr. Mathieu was negligent and a legal cause of his injuries. The court therefore rendered judgment against defendants and in favor of Mr. Mathieu in the amount of $4,952,742.48, including $203,599.88 for stipulated past medical expenses, $3,749,142.60 for future medical expenses, and $1,000,000.00 in general damages based on a life-expectancy of twenty-seven years for Mr. Mathieu. The court also awarded Areatha Mathieu, who was seventeen at the time of the shooting, $127,000.00, including $25,000.00 for past loss of consortium and $102,000.00 for future loss of consortium. Because the judge also determined that twenty percent of the fault should be attributed to Imperial Toy Company, the manufacturer of the toy gun that had been released by settlement, all of the foregoing awards were reduced by twenty percent.
On appeal by the City, the Fourth Circuit concluded that the officers were guilty of negligence. The court held that the officers' selected approach was negligent, in that it left the officers with no alternative but to use deadly force if Mr. Mathieu made any movement.[4]
We granted certiorari to review the correctness of the court of appeal's decision in this matter.[5] Because we conclude that Officers Gary Guggenheim and Armando Asaro were not negligent in the manner in which they approached Plaintiff Gerard Mathieu, we reverse the judgments of the lower courts.

ISSUE
Whether the manner in which these two police officers approached Mr. Mathieu while attempting to disarm him was negligent, such that their employer, the City of New Orleans, is liable in respondeat superior.[6]

LAW
The standard negligence analysis we employ in determining whether to impose liability under La.C.C. art. 2315 is the duty/risk analysis, which consists of the following four-prong inquiry:
I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
II. Did the defendant(s) owe a duty to the plaintiff?
III. Was the duty breached?

*322 IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
See Mart v. Hill, 505 So.2d 1120, 1122 (La. 1987); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
Under a duty/risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. As such, in order for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element). See Roberts v. Benoit, 605 So.2d 1032 (La.1991), on rehearing, 605 So.2d 1050, 1051 (La.1991); Fowler v. Roberts 556 So.2d 1, 4 (La.1989), on rehearing, 556 So.2d 13 (La.1989); see also Mundy v. D.H.H.R., 620 So.2d 811 (La. 1993); Wilson v. State through DOTD, 576 So.2d 490 (La.1991); Thomas C. Galligan, Jr., A Primer on the Patterns of Negligence, 53 La.L.Rev. 1509, 1510 (1993).

DISCUSSION
In deciding this case through the application of the duty/risk analysis, we choose to first examine the issue of whether and, if so, what type of duty the officers owed to Mr. Mathieu. The question of whether a duty exists in a particular set of circumstances is a question of law for the court to decide. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984). While we have not heretofore established a legal standard for officers to follow when approaching a subject prior to disarming him or her, we have enunciated a standard of conduct for police officers to follow when making an arrest. See Kyle v. City of New Orleans, 353 So.2d 969 (La.1977).
In effectuating an arrest, an officer is required to approach and take into custody an individual whom the officer has probable cause to believe has committed or is committing a crime. In Kyle, we held that police officers have a duty to act reasonably in effecting an arrest, and the force used must be limited to that required under the totality of the circumstances. Id. at 972-73. In approaching a person whom the officer has reason to question, whether it be on the basis of a complaint made to the officer, the officer's own observations, or, as in the instant case, where a complaint has been made to the police department and relayed to the officer, we find no reason why the standard of "reasonableness under the totality of the circumstances" enunciated in Kyle should be any different. Id. at 973. Though the purpose of the officer's instigation of contact with the suspect is different, i.e., in the former situation, the officer is approaching the person to effectuate an arrest and take the person into custody, while in the latter situation the officer is approaching the person to further investigate a complaint or his or her suspicions, the character of officer's actions in accomplishing his or her objectives in both situations is the same. In each instance, the officer must approach the suspect; in each instance, the officer is faced with the same, potentially dangerous, situation, in that he or she can never be certain as to how the suspect will react to being confronted by the police officer.
In Kyle, the issue was whether police officers were guilty of a false arrest and of using excessive force when they injured a group of persons with shotgun pellets while forcibly entering their apartment to arrest them for crimes, it was later determined, they had not committed. We held that the reasonableness of an officer's use of force depends upon the totality of the facts and circumstances in each case. We further held that a court must evaluate officers' actions against those of ordinary, prudent, and reasonable persons placed in the same position as the officers, with the same knowledge as that possessed by the officers at the time of the incident. Id. at 973. Finally, in determining whether the officers acted reasonably under the circumstances, we articulated the following factors which should be considered: (1) the *323 known character of the arrestee; (2) the risks and dangers faced by the officers; (3) the nature of the offense involved; (4) the chance of the arrestee's escape if the particular means are not employed; (5) the existence of alternative methods of arrest; (6) the physical size, strength, and weaponry of the officers as compared to the arrestee; and (7) the exigency of the moment. Id. at 973.
The reasonableness test we employed in Kyle is based upon the text of the Fourth Amendment to the United States Constitution,[7] as well as La.Code Cr.P. art. 220.[8] Given the similar nature of the character of the police officer's actions in a Kyle situation and in a situation where, as here, an officer is required to approach and instigate contact with a suspect in order to further his or her investigation, we hold that the duty owed by the officers in this case in approaching Mr. Mathieu while attempting to disarm him is one of reasonableness under the totality of the circumstances, and that the reasonableness of the officers' actions should be determined through consideration of the factors enunciated in Kyle, supra.
The next inquiry in the duty/risk analysis is whether the duty owed by these officers to Mr. Mathieu was breached. After carefully examining all of the evidence contained in the record, we find that the totality of the circumstances surrounding the shooting in this case clearly demonstrates that the lower courts were manifestly erroneous in holding that these officers breached their duty of reasonable care when they decided to employ a stealth approach and attempt to disarm Mr. Mathieu. In our view, proper application of the Kyle factors to the specific facts of this case clearly demonstrates the reasonableness of the officers' conduct under the circumstances.
The first Kyle factor is the known character of the subject. In this case, prior to the officers' arrival on the scene, the New Orleans Police dispatch had indicated that the subject was armed and had been peeping into windows at the Lafon Nursing Home. Upon arrival, the officers were notified by the nursing home's security guard that the subject who had given rise to the call was armed, and was lying in the grass forty (40) or fifty (50) feet away, possibly sleeping.[9] The officers therefore knew only that the suspect was, reportedly at least, armed, *324 suspected of criminal conduct, and lying in the grass, possibly asleep.
The second Kyle factor is the risks and dangers faced by the officer. In this case, the officers believed that because Mr. Mathieu was probably asleep or intoxicated, they would have little difficulty in disarming him. However, the officers also knew that Mr. Mathieu was probably armed. The officers were therefore faced with the risk of confronting an armed, potentially dangerous suspect at night.
The third Kyle factor is the nature of the offense involved. In this case, the officers were responding to a complaint of an armed individual peering in windows at a nursing home. While the officers were responding to the call to investigate the matter, and assumedly to then make a determination as to whether any specific criminal offense(s) had been committed such that an arrest was warranted, given the fact that the complained of behavior involved a weapon the nature of the offense must be characterized, and the officers involved had every reason to treat it, as serious and potentially life-threatening.
The fourth Kyle factor is the chance of the subject's escape if the particular means are not employed. The likelihood of escape in this particular situation was high. The officers testified they were fearful that if they delayed their approach, Mr. Mathieu would escape into the neighboring residential area. Given the fact that this was the second time that evening that the police had been called to that location for the exact same complaint, and the officer responding to the first call had reported that the suspect was no longer in the area, it was certainly reasonable for the officers to believe that the subject might escape again if they did not act quickly. Furthermore, the incident took place at night near a densely populated residential area, making it unlikely that the suspect would be located again that night if he managed to escape.
The fifth Kyle factor is the existence of alternative methods. As plaintiff's expert testified, alternative methods for confronting and disarming the suspect did exist.[10] However, the existence of other available alternative methods does not, in and of itself, render the method chosen unreasonable.[11] Therefore, while plaintiffs' theory of their case is that the officers were negligent in their method of approaching Mr. Mathieu, the very existence of this factor in testing the reasonableness of the officers' actions clearly demonstrates that the scope of the officers' duty to act reasonably under the circumstances does not operate to restrict the officers to employing only the best of several available alternatives. Instead, the officers in the instant case were simply required to choose a reasonable alternative under the circumstances which existed.
The sixth Kyle factor is the physical size, strength and weaponry of the officers as compared to the suspect. In this instance, the suspect was outnumbered two to one. The officers were standing and in an "L Figuration," with the lead officer attempting to quietly approach the suspect. The subject, *325 while lying in the grass and apparently asleep, was armed and possibly intoxicated. Therefore, while the officers enjoyed a tactical advantage, they also faced an armed suspect who might be irrational due to intoxication.
The seventh Kyle factor is the exigency of the moment. In this case, the incident at issue occurred near a large residential area. The officers testified that they had been working in the area for several years and knew from past experience that young children were frequently in the area at this time of night. The officers were aware that this part of the City of New Orleans is an area with a high crime rate and much drug related crime. The officers believed that the subject in this case might be intoxicated or on drugs, and further believed that the subject had to be disarmed immediately before he could escape into the neighboring residential area where others would be put in danger. Given the knowledge the officers possessed at that time and the situation which existed, it was not unreasonable for the officers to believe that it was necessary to disarm the suspect immediately.
While the officers' method of approaching Mr. Mathieu may not, as plaintiffs' argue, have been the "best" method of approach, officers are not held to that high a standard of care. See Kyle, supra. See also Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); United States v. Martinez-Fuerte, 428 U.S. 543, 556-57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976). Instead, officers are simply held to choosing a course of action which is reasonable under the circumstances. In other words, the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best," or even a "better" method of approach. See Scott v. Henrich, 39 F.3d 912 (9th Cir. (Mont.) 1994).[12] As the *326 Scott court noted, officers confronted with a situation which requires them to approach and instigate contact with a suspect are only required to choose a course of action within that range identified as "reasonable." Therefore, we find that the decision of the officers herein to employ a "stealth approach" in initiating contact with Mr. Mathieu was not, per se, unreasonable.
Furthermore, after carefully considering the testimony in the record[13] in light of the factors enunciated in Kyle, we also find that the specific method used by the officers to approach Mr. Mathieu cannot be held to be unreasonable. These officers had to make a quick decision under extremely charged circumstances. In an attempt to disarm what they reasonably believed to be an armed and dangerous criminal suspect, the officers chose the course of action that in their considered opinion would best achieve that objective. Given the circumstances which existed, see supra Kyle factors analysis, we find that the lower courts were manifestly erroneous in their conclusions that Officers Asaro and Guggenheim were negligent in acting as they did.
A negative answer to any of the inquiries of the duty/risk analysis results in a determination of no liability. See supra. Therefore, as we have determined that the lower courts were manifestly erroneous in finding that the officers breached their duty to Mr. Mathieu, there can be no finding of liability in this case and we need not consider the remaining questions in the duty/risk analysis.[14] Moreover, because our resolution of the negligence issue is dispositive in this case, we need not address applicant's remaining assignments of error.

DECREE
REVERSED.
NOTES
[*] Judge William Norris, III, Court of Appeal, Second Circuit, sitting by assignment in place of Justice James L. Dennis; Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participating as Associate Justice Pro Tempore, effective September 1, 1994.

Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[1] Officer Asaro testified that he and Officer Guggenheim approached in an "L-Figuration," with Officer Guggenheim in front and Officer Asaro following behind.
[2] After the shooting, the man was rendered a paraplegic, and while he survived through the trial of this matter, he died prior to the publication date of this opinion.
[3] This matter was tried by a judge pursuant to the pre-1993 amendment version of La.R.S. 13:5105, which provided: "No suit against the state or a state agency or political subdivision shall be tried by jury."
[4] Mathieu v. Imperial Toy Corporation, 93-1182 (La.App. 4th Cir. 1/13/94), 632 So.2d 375.
[5] Mathieu v. Imperial Toy Corporation, 94-0952 (La. 6/17/94), 638 So.2d 1075.
[6] LSA-C.C. Art. 2320 provides:

Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.
The master is answerable for the offenses and quasi-offenses committed by the servants, according to the rules which are explained under the title: Of quasi-contracts, and of offenses and quasi-offenses.
[7] See also Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[8] La.Code Cr.P. art. 220 provides:

A person shall submit peaceably to lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.
[9] After careful examination of all of the testimony and documentary evidence, we are convinced that it was reasonable under these particular circumstances for the officers not to seek information from Mr. Edgar Tanner, an area resident who was sitting on his front porch during the time this incident took place, or other persons in the vicinity. The officers were responding to a complaint of an armed man peering into windows at the Lafon Nursing Home. Upon arrival, the officers were met by a security guard and a nursing assistant from the nursing home, who informed the officers that the man with the gun was lying in the grass on the lawn next to the nursing home. While plaintiffs' expert testified that the officers should have sought further information from Mr. Tanner and others in the vicinity, the fallacy of this position was later exposed during the City's cross-examination of plaintiffs' expert:

Q. Let me ask you this Mr. Purdy [plaintiffs' expert], as a police officer of some 50 years experience of law enforcement experience, you would not rely on an individual telling you that they think the subject over there has a toy gun, you would not rely on that assertion?
A. Absolutely not....
* * * * * *
Q. So you would agree that given the nature of the toy gun that Gerard Mathieu had and the manner in which he used it, it was not incumbent (sic) upon those 2 police officers to determine whether that was a real or counterfeit gun, would you agree with that statement?
A. That's correct, not in advance, that is for sure.
* * * * * *
Q.... they could have just simply gotten back in their car after talking to the security guard and the nurse, made the approach in the car without talking to anyone, Mr. Tanner or anybody else, and that would have been appropriate in your opinion?
A. Yes. As a matter of fact it's probably what I would have done.
[10] Plaintiffs' expert testified that if the officers had pulled their patrol car closer to Mathieu and shined the vehicle's headlights on him while they remained behind the car doors, instead of approaching through an open area, Mathieu would have been less likely to point his gun, and the officers would have been less likely to feel threatened into shooting. Plaintiffs' expert was also of the opinion that gunfire might have been avoided if the officers had sought more information from the nursing home employees while waiting for back-up police officers to arrive. See supra, note 9.
[11] As plaintiffs' expert testified, even if the officers had used the approach he suggested, it would be impossible to determine what Mr. Mathieu's reaction would have been. Plaintiffs' expert testified that because it is impossible to know how Mr. Mathieu would have reacted if the officers had utilized another method of approach, it was also quite possible that Mr. Mathieu would have awakened and pointed the gun at the officers regardless of the method of approach utilized, and that the officers would have been justified in shooting Mr. Mathieu had he pointed the gun at them, even if they had followed his suggested course of action and were positioned behind the open doors of their patrol car.

In contrast, the City's expert testified that the urgency of disarming Mr. Mathieu before he could escape into the nearby residential area outweighed the alternatives suggested by plaintiff's expert. The City's expert testified that only Mr. Mathieu could have prevented the incident by not pointing his gun at the police and by permitting the officers to disarm him.
[12] In Scott, a deadly force case decided under 42 U.S.C. § 1983, two Butte, Montana police officers responded to reports that a man was firing a gun. When the officers arrived in the general area, a motel manager pointed to an apartment building where the gunman was situated. A boy told one of the officers that he had seen the man fire a couple of shots and that the man was acting strange or crazy, and he was staggering. The officers quickly approached a street level door of the building where the motel manager had told the officers the suspect was located. One of the officers banged on and kicked the door and yelled something to the effect of "Police, police officers, open up," while the second officer stood behind him providing cover. Minutes later, the officer again banged on the door and identified himself as a police officer. After the officers heard fumbling with the door's lock, the door opened and the gunman was standing in the doorway, wielding what the officers described as a "long gun" and pointing it directly at them. The officer who had banged on the door fired and missed. The second officer opened fire, believing that the suspect, rather than his partner, had fired the shot. The officer fired four shots, one of which killed the suspect. The suspect's "long gun" turned out to be unloaded.

The facts of the Scott case are analogous to the instant case: two police officers respond to a "man with a gun" call; the officers make a tactical decision to confront the subject; the subject points what clearly appears to be a functioning firearm directly at the officers; and the officers shoot the subject. In Scott, the plaintiffs, much like the plaintiffs in this case, argued that the officers should have used alternative measures before approaching and knocking on the door where the suspect was located. Though the Scott case was decided under 42 U.S.C. § 1983, we find the reasoning employed by the Scott court in determining whether the officers' conduct was reasonable, persuasive:
[T]he appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them. See, e.g., Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); United States v. Martinez-Fuerte, 428 U.S. 543, 556-57 n. 12, 96 S.Ct. 3074, 3082-83 n. 12, 49 L.Ed.2d 1116 (1976). Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission. Instead, he would need to ascertain the least intrusive alternative (an inherently SUBJECTIVE determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment.
Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable. The officers here clearly did: It's hardly unreasonable for officers to take up arms, knock on the door of an apartment and identify themselves as police when an armed man who, they are told, recently fired shots and is acting `crazy' lurks inside.
Scott, 39 F.3d at 915.
[13] See supra, notes 9-11.
[14] Though our determination that the lower courts were manifestly erroneous in finding that the officers breached their duty to Mr. Mathieu makes it unnecessary to examine the question of whether the officers' method of approaching Mr. Mathieu was a cause-in-fact of his injuries, we note that plaintiffs' expert psychiatrist, Dr. Ritter, testified that Mr. Mathieu had not been taking his medication at the time of the incident and was therefore in a state of paranoid schizophrenia. Dr. Ritter also testified that in his opinion, Mr. Mathieu was using the toy weapon as "a fallacious method of defending one self (sic) or fallacious method of coercing other people into either leaving him alone, or ... doing something, intimidation." This testimony, when read in conjunction with the testimony of both plaintiffs' and the City's respective experts, see supra notes 9-11, makes the lower courts' finding that the officers' method of approach was a cause-in-fact of Mr. Mathieu's injuries tenuous at best. It is not at all certain, or even more likely than not, that the same result would not have occurred had the officers employed plaintiffs' expert's purported "better" method of approaching Mr. Mathieu. The proof of this proposition lies in Mr. Mathieu's actions: after Officer Guggenheim fired six shots at Mr. Mathieu and rolled on the ground to reload his weapon, Mr. Mathieu pointed his weapon at Officer Asaro instead of dropping it immediately, forcing Officer Asaro to shoot him.