65 So.3d 201 (2011)
Sandy BELLANGER, individually and on behalf of her minor child, Tsunami S. Dodge
v.
Craig WEBRE, Sheriff of Lafourche Parish, the Lafourche Parish Sheriff's Office, Deputy Ben Dempster, Deputy Jeff Prevost and Deputy Jude Cantrelle.
No. 2010 CA 0720.
Court of Appeal of Louisiana, First Circuit.
May 6, 2011.
*203 David W. Ardoin, Thibodaux, LA, for Plaintiffs-Appellees Sandy Bellagner, Individually and on Behalf of her Minor Child Tsunami S. Dodge.
Donald F. Harang, Jr., Larose, LA, Louis C. LaCour, Jr., New Orleans, LA, for Defendants-Appellants Craig Webre, Sheriff for the Parish of Lafourche, Lafourche Parish Sheriffs Office, Deputy Ben Dempster, Deputy Jeff Prevost, and Deputy Jude Cantrelle.
Before CARTER, C.J., KUHN, GAIDRY, HUGHES, and WELCH, JJ.
WELCH, J.
Defendants, Craig Webre, Sheriff of Lafourche Parish, Benjamin Dempster, Jeffery Prevost, and Jude Cantrelle (collectively referred to as "the Sheriff), appeal a judgment finding the Sheriff 50% at fault in causing the death of an infant and awarding plaintiff, Sandy Bellanger (Bellanger), survival and wrongful death damages. The Sheriff also appeals a judgment awarding Bellanger damages for false imprisonment. We reverse.

FACTUAL AND PROCEDURAL BACKGROUND
On the afternoon of May 23, 2007, an infant, Typhoon Dodge, died from a gunshot *204 wound sustained during a shootout initiated when the child's father, Albert Dewayne Dodge (Dodge), an aggravated battery suspect, suddenly and unexpectedly fired a hidden weapon at point-blank range at Lafourche Parish Sherriff's deputy Benjamin Dempster, who was attempting to arrest Dodge inside a FEMA trailer. Dodge also died from gunshot wounds sustained in the incident. Bellanger, Typhoon's mother, filed this wrongful death lawsuit individually and on behalf of her minor child, Tsunami Dodge, against Lafourche Parish Sheriff Craig Weber and Deputy Dempster, Deputy Jeffery Prevost, and Deputy Jude Cantrelle. Bellanger alleged that the deputies were at fault in causing the child's death for failing to abide by accepted police procedures in similar situations, for improperly entering a private home, and for engaging Dodge with weapons. Bellanger later amended her petition to state a claim for damages for false imprisonment based on her detention by police officers following the gun battle for attempting to conceal Dodge's presence in the trailer to prevent his arrest. The Sheriff denied liability, asserting that Dodge's intentional act of ambushing the officers endangered the life of his child and caused the child's death. The Sheriff further pled the comparative negligence and/or fault of Bellanger, who, they urged, acted in disregard for her son's life by failing to remove the child from the room in which Dodge was hiding to avoid arrest.
Following a bench trial, the trial court entered judgment in favor of Bellanger. In its oral reasons for judgment, the trial court found that while the officers did have probable cause to believe that Dodge had committed a crime, they did not have an arrest warrant or search warrant to enter the trailer to arrest Dodge. It found that exigent circumstances traditionally justifying a warrantless entry into a home were not present and concluded that the officers entered the home without lawful authority. The court further found that the officers' unlawful entry played a factor in Typhoon's death, but that Dodge, who initiated the gunfire by shooting at Deputy Dempster at close range after the deputy had holstered his gun, exceeded his lawful right to resist arrest and also contributed to his son's death. Bellanger was awarded $175,000.00 for the death of her son and $15,000.00 in survival damages. Fault was apportioned 50% to the Sheriff and 50% to Dodge in causing the child's death. Lastly, upon finding that Bellanger's detention for obstruction of justice was without cause and for a longer period of time than necessary, the court awarded. Bellanger $7,500.00 on her false imprisonment claim.
In this appeal, the Sheriff contends that the trial court erred in finding that the deputies breached a duty to the child and that the alleged breach of duty was a cause in fact or the legal cause of Typhoon's death. They also assert that the trial court erred in finding that the fatal shot was fired by Deputy Dempster and in its conclusion that Bellanger was falsely imprisoned.

DISCUSSION

Liability for the death of Typhoon Dodge
We first examine the propriety of the trial court's finding of liability for the death of Typhoon based on the officers' warrantless entry into the FEMA trailer to arrest Dodge. The record reflects that on May 23, 2007, Dodge and Bellanger lived together in a FEMA trailer at 213 West 136th Street in Cut Off, Louisiana with their one-year old daughter, Tsunami, and their infant son, Typhoon. There was a history of domestic violence between Dodge and Bellanger and both were drug addicts.
*205 On the night of May 22, 2007, Dodge did not come home after work. Bellanger suspected that he had been using drugs again when he did not come home. She called her sponsor, who advised her to leave the trailer. Bellanger knew that Dodge kept a handgun on the side of their bed, but did not see it. She decided to stay at the trailer, but knowing that her sponsor would prevent her from doing so, she lied and told her sponsor that she had left or might leave.
At approximately 10:46 a.m. the following morning, Deputy Dempster responded to a battery complaint at the home of Edward Bourgeois. Upon arriving at Bourgeois' home, Deputy Dempster discovered that Bourgeois had been badly beaten and was in an ambulance. During the investigation, Bourgeois told Deputy Dempster that his assailant was a white male he knew as "Scotty," who drove a brown Jimmy truck with a wooden carpenter ladder on top. Bourgeois stated that he and his assailant had been using cocaine that morning and that when the man came out of the bathroom, he suddenly and for no apparent reason became irate and began attacking and beating Bourgeois. He stated that his assailant had him in a headlock and was trying to choke him, and Bourgeois believed that the man was trying to kill him. After Bourgeois punched the suspect in the groin, the suspect grabbed a fire extinguisher and started beating Bourgeois with it, then fled. While Deputy Dempster was investigating at the scene, neighbors confirmed that they had seen a brown Jimmy truck there that morning. Deputy Dempster followed Bourgeois to the hospital and continued his investigation, during which Bourgeois told him that his attacker used to live down West 136th or 137th Street behind "Old Bayou Inn" in a FEMA trailer near the end of a road that curved both to the left and right.
Following the directions given to him by Bourgeois, and after calling for backup because he knew that the suspect was on narcotics, Deputy Dempster spotted a brown Jimmy truck with a carpenter ladder on top parked outside of the lone FEMA trailer on 136th Street. He met Deputy Cantrelle, who responded to the back-up call, half-way down the street and proceeded to the FEMA trailer. Deputy Cantrelle immediately recognized the FEMA trailer because he had been there several times before in response to domestic violence incidents in which both Dodge and Bellanger had been charged. Deputy Cantrelle knew Bellanger from school and also knew of Dodge from the domestic violence incidents.
Dodge, who was inside the trailer with Bellanger, Tsunami, and Typhoon, spotted police vehicles driving in the area and told Bellanger "don't let them in, they're coming for me, don't let them in." Bellanger stated that upon her return to the trailer from a walk at around noon, she discovered that Dodge was injured, and Dodge told. Bellanger he had been in a fight. Bellanger could tell that Dodge was high, and they argued about his drug use. Bellanger stated that they later made up and had sex. When Dodge told her that the police were coming for him, Bellanger questioned whether he had killed someone. Dodge told her that he had been in a fight with someone he was getting high with, and that was why he believed the police were coming to get him. At this time, Typhoon was in the bedroom with his parents, either in his parents' bed or in a crib beside his parents' bed, from which the infant would crawl onto his parents' bed and back to the crib. Tsunami was taking a nap on the sofa.
When Deputies Dempster and Cantrelle arrived at the trailer, Deputy Dempster *206 went to the front door of the trailer, knocked repeatedly for approximately 2 to 4 minutes, and announced, "Sheriffs Office." He stated that he could hear loud thumps and noises by the front door, but when no one answered, he went around to the back door, where Deputy Cantrelle had been knocking and announcing the officers' presence. Deputy Prevost also went to the back door upon arriving at the scene. Deputy Prevost realized that the suspect they were looking for was Dodge because he too had been to a trailer that was formerly parked directly behind the FEMA trailer in which Dodge lived.
The officers could hear the sounds of footsteps shuffling about the trailer, but no one immediately responded to their knocks. Bellanger explained that she did not answer the front door because she was getting dressed and that when she finished dressing, she heard the back door "jiggle" and open, and she headed toward the back door. Bellanger recounted that when she left the bedroom, Typhoon was in the bed with Dodge, and Tsunami followed her to the back door.
According to Deputy Cantrelle, the back door to the trailer was damaged and when he pulled on the lock, the door opened. He saw Bellanger standing at the back door with a child. Because of the previous domestic violence situations and because he could hear running about in the trailer after knocking on the door, Deputy Cantrelle feared that a violent situation may be transpiring in the trailer. He told Bellanger that he was looking for the driver of the brown Jimmy truck, and Bellanger told him he was not there. Deputy Cantrelle told her that the man had just committed an aggravated battery and may have been doing cocaine, and that she and her child may be in danger. Bellanger told him she did not want the police to go inside and again told Deputy Cantrelle that Dodge was not there. Deputy Cantrelle described Bellanger as being in a "frantic panic," and stated that he sensed she was afraid. Deputy Cantrelle told Bellanger that the deputies wanted to go in and clear the trailer to make sure that Dodge was not there.
Bellanger exited the trailer, followed by the child, and Deputy Cantrelle stayed outside with her. Deputy Cantrelle stated that he believed they were faced with an emergency situation requiring an immediate entry into the home given the fact that the officers believed an aggravated battery suspect who had been on a cocaine binge was hiding in the trailer, there was a known history of domestic violence between Dodge and Bellanger, and when she answered the door, Bellanger appeared to be frightened.
Deputy Dempster testified that he asked Bellanger if there was any one else in the trailer, and she told him "no." He stated that he even asked her if there were any animals in the house and again she answered negatively, telling him there was "nothing" inside of the trailer. Deputy Dempster suspected that Bellanger was hiding Dodge's presence in the trailer from the officers. He believed that because the crime Dodge was suspected of committing demonstrated a high level of violence and because Dodge was believed to have been doing cocaine, Dodge presented a danger to himself, anyone inside the trailer, and anyone he may come into contact with that day. The deputy also thought that Dodge was inside of the trailer because of the noises he had heard after knocking on the door and his belief that Bellanger was lying because of the suspicious manner in which she was acting.
Deputy Dempster entered the trailer first, followed by Deputy Prevost. The officers had their weapons drawn and walked to the front of the trailer, where *207 the bedroom was. Deputy Prevost testified that he saw a child sitting on the bed as they made their way to the bedroom. When Deputy Dempster first spotted Dodge, he was naked, crouching between the bed and the wall. Deputy Dempster ordered Dodge to get up, and when he refused to respond, Deputy Dempster holstered his weapon and leaned over the bed to grab him. As Deputy Dempster leaned over, Dodge pulled out a .357 magnum revolver, pointed it at the deputy's face, and fired a shot at Deputy Dempster. The bullet hit Deputy Dempster on the top of his bullet proof vest and the impact of the gunshot caused Deputy Dempster to spin completely around. Deputy Dempster squared up to Dodge and started returning fire. As Deputy Dempster returned fire, Dodge continued to advance toward him, climbing over the bed. Deputy Dempster continued to fire and retreat, attempting to put as much distance between himself and Dodge as possible. Dodge continued advancing and the gunfire continued until Deputy Dempster ran out of ammunition. When the shooting ceased, Deputy Prevost, who had immediately sought cover after the first shot was fired, helped Deputy Dempster get outside the trailer. Deputies Prevost and Cantrelle reentered the trailer. They found Dodge's body by the front door and Dodge's revolver. The deputies found Typhoon lying within a foot of the bed. The infant lived a short time and was pronounced dead by paramedics who arrived later at the scene.
The evidence showed that Deputy Dempster fired 13 shots from his weapon, 9 of which struck Dodge. It was not established at trial how many shots were fired from Dodge's weapon, but his gun was empty when it was found near his body after the shooting. The parties concede that there were no bullet fragments to determine which gun the bullet that killed Typhoon was fired from.
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles of La. C.C. art. 2315. For liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard of care; (2) the defendant failed to conform his conduct to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiffs injuries; (4) the substandard conduct was a legal cause of the plaintiffs injuries; and (5) actual damages. Mathieu v. Imperial Toy Corporation, 94-0952, pp. 4-5 (La.11/30/94), 646 So.2d 318, 322. A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Bridgefield Casualty Insurance Company v. J.E.S., Inc., 2009-0725, p. 5 (La.App. 1st Cir.10/23/09), 29 So.3d 570, 573.
A party's conduct is a cause in fact of the harm if it was a substantial factor in bringing about the harm. The act is a cause in fact in bringing about the injury when the harm would not have occurred without it. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability. Toston v. Pardon, 2003-1747, p. 11 (La.4/23/04), 874 So.2d 791, 799. A cause in fact determination is a factual one that is governed by the manifest error standard of review. White v. City of Baker, Baker City Police Department, 95-2009, p. 5 (La.App. 1st Cir.5/17/96), 676 So.2d 121, 124, writ denied, 96-1547 (La.9/27/96), 679 So.2d 1351. Legal cause, on the other hand, presents a legal question, and requires a proximate relation between the actions of a defendant and the harm which occurs, and such relation *208 must be substantial in character. Rando v. Anco Insulations, Inc., XXXX-XXXX, 2008-1169, p. 31 (La.5/22/09), 16 So.3d 1065, 1088; Roberts v. Benoit, 605 So.2d 1032, 1055 (La.1991).
The trial court found that the "negligent act" forming the basis for the imposition of liability was the officers' entry into the FEMA trailer absent a warrant or exigent circumstances and that their unlawful presence inside of the trailer caused Typhoon's death. Bellanger urges that the deputies breached the constitutional requirement to obtain a warrant before entering a home or in the alternative, to have exigent circumstances, and the defendant's breach of these requirements caused Typhoon's death. She also urges that the officers violated one of the very tenants of their trainingto attempt to avoid a potentially dangerous, life threatening situation. She submits that Deputies Dempster and Prevost entered the trailer unlawfully and escalated what they knew could be a dangerous situation. Bellanger argues that the entire situation could have been easily avoided had the deputies simply remained outside and obtained a warrant. She also faults the deputies for failing to remove Typhoon, who was in plain sight on the bed, from the potentially dangerous situation.
We need not determine whether the officers would have been required to obtain a warrant before entering the FEMA trailer for the purpose of a criminal prosecution to resolve the liability issue. While both the United States and Louisiana Constitutions protect against unreasonable searches and seizures, the penalty for violating these protections is the exclusion of evidence in a criminal prosecution. State v. Benjamin, 1997-3065, pp. 2-3 (La.12/1/98), 722 So.2d 988, 989. The absence of a warrant could only be actionable for the purpose of civil liability under the duty-risk analysis if it is both a cause in fact and the legal cause of the harm. We find that under all of the circumstances of this case, the absence of a warrant was not the cause in fact or the legal cause of Typhoon's death, and hold that the trial court erred in imposing liability on the Sheriff on the basis of the deputies' warrantless entry into the FEMA trailer.
The absence of a warrant was not the cause of Typhoon's death for the simple reason that there has been no showing that the possession of a warrant would have altered the outcome. Dodge clearly knew that the officers were coming to arrest him; however, there is nothing in the record to indicate that Dodge was aware they did not have a warrant or that he would have abandoned his murderous plan to escape arrest if the officers in fact had a warrant. In short, there is no evidence from which it could be found, more likely than not, that the same result would not have occurred had the officers obtained a warrant before entering the trailer.
Moreover, the failure of the officers to obtain a warrant prior to entering the trailer was not the legal cause of Typhoon's death. The record demonstrates that Dodge, believing that the police were going to arrest him, decided to evade arrest by arming himself with a weapon and hiding out near the bed on which he had to know his infant son was present. Upon entering the bedroom and seeing Dodge crouched naked in a corner, there was no reason for the officers to believe that Dodge presented a lethal threat to anyone in the room. In fact, the evidence showed that Deputy Dempster holstered his gun as he bent over to grab Dodge. However, Dodge, who had waited for Officer Dempster to get as close as possible to him before revealing his weapon, pointed a gun at Deputy Dempster's face and fired a shot *209 at him at point-blank range. At that point, Deputy Dempster had no alternative but to protect himself and Deputy Prevost by returning fire. We find that Dodge's initiation of the gunfight by his ambush assault on Deputy Dempster, within the confines of the cramped FEMA trailer and in close proximity to his son, in complete disregard for his son's life, constituted the sole cause of Typhoon's death. Accordingly, we reverse that portion of the judgment awarding Bellanger wrongful death and survival damages.[1]

False Imprisonment
The basis for Bellanger's false imprisonment claim is that after the shootout at her trailer, she was detained and placed in custody and handcuffed to a bench for several hours before giving her statement and ultimately being released. The record reflects that Deputy Cantrelle placed Bellanger under arrest for obstruction of justice for lying to the deputies about Dodge's presence in the trailer. Deputy Cantrelle handcuffed Bellanger and placed her in the back seat of his police car. He testified that he was separated from her at that point because he and the other deputies were brought to the station to give their statements. Bellanger was transported to the station and held there until she gave a statement to State Police at 5:10 p.m. She was not prosecuted for the crime. The trial court found that Bellanger had been falsely imprisoned because her detention for obstruction of justice was without cause and for a longer period of time than necessary.
The tort of false arrest or false imprisonment occurs when one arrests and restrains another against his will and without statutory authority. Kennedy v. Sheriff of East Baton Rouge, 2005-1418, p. 32 (La.7/10/06), 935 So.2d 669, 690. There are two essential elements to this tort: (1) detention of the person; and (2) unlawfulness of the detention. Id. Bellanger clearly was detained following the shootout. The only dispute is whether the detention was unlawful.
A peace officer may lawfully arrest a person without a warrant when the person to be arrested has committed an offense in his presence or when the officer has reasonable cause to believe that the person has committed an offense, even if not in the presence of the officer. La. C.Cr.P. art. 213(1) & (3). Reasonable cause exists when the facts and circumstances within the arresting officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. Gibson v. State, 99-1730, p. 7 (La.4/11/00), 758 So.2d 782, 788, cert. denied, 531 U.S. 1052, 121 S.Ct. 656, 148 L.Ed.2d 559 (2000); Wolfe v. Wiener Enterprises, Inc., 94-2409 (La.1/13/95), 648 So.2d 1293, 1295. Whether a law enforcement officer has complied with the reasonable cause standard in making a warrantless arrest is a substantive determination to be made by the trial court from the facts and circumstances of each case. Theriot v. State Department of Wildlife and Fisheries, 94-1536, p. 8 (La.App. 1st Cir. 4/7/95), 661 So.2d 986, 991, writ denied, 95-1617 (La.10/6/95), 662 So.2d 1041. The proper standard of review is whether the trial court committed an error of law or made a factual finding that is manifestly erroneous or clearly wrong. If the trial court's decision *210 is reasonable in light of the record reviewed in its entirety, this court may not reverse even if we would have weighed the evidence differently. Where there is no dispute of fact, the question of probable cause is a question of law. Gibson, 99-1730 at p. 6, 758 So.2d at 788.
Louisiana Revised Statutes 14:25 defines "accessory after the fact" as any person who, after the commission of a felony, harbors, conceals, or aids the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment. Bellanger clearly had reasonable ground to believe that Dodge committed a felony, as she testified that Dodge told her he had been in a fight and that the police were coming to arrest him. Despite this knowledge, Bellanger attempted to conceal Dodge in the trailer by lying to the deputies about his presence to prevent his arrest. Because it was established that Bellanger knew that Dodge had committed a serious crime and that the police were looking for him to arrest him and also that Bellanger attempted to conceal Dodge to prevent his arrest, the trial court erred in finding that Bellanger's detention for obstruction of justice after the shooting was without reasonable cause. Therefore, we reverse that portion of the judgment awarding damages to Bellanger for false arrest.

CONCLUSION
For the foregoing reasons, the judgment appealed from is reversed. Judgment is hereby rendered dismissing all of plaintiffs claims against all defendants. All costs of this appeal are assessed to appellant, Sandy Bellanger.
REVERSED AND RENDERED.
KUHN, J., concurs for the reasons assigned before CARTER.
GAIDRY, J., dissenting in part and concurring in part.
CARTER, C.J., concurs with reasons.
HUGHES, J., dissents with reasons.
CARTER, C.J., concurring.
I join in the decision of the court and write separately to express an additional reason for reversing the finding of liability on the part of the Sheriffs Office and the officers.
The scope of an officer's duty is to choose a course of action that is reasonable under the circumstances. Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173, 1177. The following factors, originally set forth in Kyle v. City of New Orleans, 353 So.2d 969 (La.1977), must be considered to determine whether the officers' conduct was reasonable: 1) the known character of the arrestee; 2) the risks and dangers faced by the officer; 3) the nature of the offense involved; 4) the chance of the arrestee's escape if the particular means are not employed; 5) the existence of alternative means of arrest; 6) the physical size, strength, and weaponry of the officer as compared to the arrestee; 7) the exigency of the moment. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318, 323-24.
Considering the totality of the circumstances and the Kyle factors, I find that the officers did not breach their duty by entering the trailer residence as plaintiff contends. The officers were informed that Dodge had ingested cocaine and violently battered a man earlier in the day without provocation. Upon arriving at the trailer residence, the officers knocked and announced their presence. The officers suspected that a violent, potentially inebriated man with a known history of domestic violence was inside the trailer. The plaintiff, *211 who answered the door, was not forthcoming about whether Dodge was present in the trailer. The officers heard additional people moving in the trailer, and it was unclear exactly how many people were present and subject to Dodge's violent whims.
The role of the courts in considering officers' conduct is not to determine whether the officers should have acted differently or if there were better options available, but only whether the officers' actions were reasonable under a totality of the circumstances. Syrie, 693 So.2d at 1177. As set forth herein, I find that the officers' actions were reasonable under the circumstances.
GAIDRY, J., dissenting in part and concurring in part.
I respectfully disagree with the majority's conclusion that the trial court committed manifest error when it concluded that the defendants were liable to Sandy Bellanger for the death of her minor child, although I may have seen this differently had I been the trier of fact. While I recognize that a police officer does not need to first obtain an arrest warrant to arrest someone who has committed a felony, I do not believe this right to arrest allows a police officer to violate the Fourth Amendment of the United States Constitution and Louisiana Constitution, article 1, Section 5, and to make a warrantless entry into someone's home unless that entry is justified under an exception to the warrant requirement (i.e. consent, exigent circumstances). That being said, I do not find the warrant/warrantless entry issue to be the legal cause of the plaintiffs injuries.
The standard negligence analysis employed in determining whether to impose liability under Louisiana Civil Code article 2315 is the duty-risk analysis. In order for liability to attach under a duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiffs injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiffs injuries; and (5) actual damages. Mathieu v. Imperial Toy Corp., 94-0952, pp. 4-5 (La.11/30/94), 646 So.2d 318, 322.
We first consider the duty owed by the defendants to Typhoon Dodge and Sandy Bellanger. A police officer has a duty to the public which arises from a social contract that confers upon him the authority to enforce the laws of the city and state within his jurisdiction and subject to the order of his superior officers. The police officer's duty is to exercise the authority conferred upon him with respect and concern for the well being of those he is employed to protect and serve. Dyer v. City of New Orleans, 96-2802, p. 5 (La. App. 4 Cir. 8/20/97), 700 So.2d 866, writ denied, 97-2347 (La.11/26/97), 703 So.2d 650.
In considering whether an officer breached the duty owed to the public, the officer's conduct is evaluated based on its reasonableness under the circumstances. His course of conduct need only be reasonable, not ideal. Dyer, 96-2802 at p. 6, 700 So.2d at 869. The court must evaluate the officer's actions against those of ordinary, prudent, and reasonable persons placed in the same position as the officer, with the same knowledge as that possessed by the officer at the time of the incident. The following factors should be considered: (1) the known character of the arrestee; (2) the risks and dangers faced by the officer; (3) the nature of the offense involved; (4) the chance of the arrestee's escape if the *212 particular means are not employed; (5) the existence of alternative methods of arrest; (6) the physical size, strength, and weaponry of the officer as compared to the arrestee; and (7) the exigency of the moment. Mathieu, 94-0952 at p. 6, 646 So.2d at 322-23, citing Kyle v. City of New Orleans, 353 So.2d 969, 973 (La.1977).
Thus, the proper inquiry is whether, considering the Mathieu factors, the deputies exercised their authority with respect and concern for the wellbeing of others. First, the deputies knew when they went to the FEMA trailer that they were there to arrest Dodge for an aggravated battery. The deputies were all aware that Dodge had reportedly been using drugs that morning, that his behavior had been erratic and violent, and it was broad daylight. Secondly, the trailer had only two entrances, and there were three deputies present. There was no known immediate danger to anyone nor was there any ongoing crime being committed. Before entering, the deputies removed a woman and child (Bellanger and Tsunami) from the trailer. Nothing prevented the deputies from determining whether there were any other adults or children still in the trailer. After entering the trailer and seeing the child, nothing prevented the deputies from exiting and seeking a method (wait, talk, cut off utilities, etc.) to safely remove the child and/or Dodge himself. There were no exigent circumstances requiring Dodge's immediate arrest. In failing to do so, I find that the deputies breached their duty to act reasonably to exercise their authority with respect and concern for the well being of those they are employed to protect and serve.
The next step in our inquiry is to determine whether Bellanger met her burden of establishing a factual, causal relationship between the deputies' actions and Typhoon's death, i.e., a cause in fact. Cause in fact is generally a "but for" inquiry; that is, if Typhoon probably would not have died but for the deputies' substandard conduct, such conduct is a cause in fact. Roberts v. Benoit, 605 So.2d 1032, 1042 (La.1991). Stated differently, the inquiry is "[d]id the defendant contribute to the plaintiffs harm or is the defendant a cause of the plaintiffs harm?" Id. An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the "substantial factor" test. Under this test, cause in fact is found to exist when the defendant's conduct was a "substantial factor" in bringing about plaintiffs harm. Id. Under either method, it is irrelevant to the determination of cause in fact whether the defendants' actions were lawful, unlawful, intentional, unintentional, negligent or non-negligent; rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerations-morality, culpability or responsibility-involved in the duty-risk analysis. Id. The cause in fact inquiry is of very limited scope. To the extent the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Id. Although certainly not the only cause of Typhoon's death, the deputies' entry into the trailer at the time, and under the circumstance of this case as set forth above, was a cause in fact of the resulting harm.
As to which bullet struck the child, the trial court noted that during the exchange of gunfire, Dodge was moving towards the deputies and away from Typhoon. Deputy Dempster was shooting in Typhoon's general direction. Based on this evidence, the court concluded that Typhoon died as a result of shots fired by Deputy Dempster. This finding has not been shown to be clearly wrong or manifestly erroneous. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
*213 Having determined that the deputies' negligence was a cause in fact of Typhoon's death, we now must consider whether their actions were a legal cause of his death, i.e., whether the injury plaintiff sustained was within the contemplation of the duty discussed above. There is no "rule" for determining the scope of the duty; it is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Roberts, 605 So.2d at 1044. Clearly, the harm sought to be prevented by an officer's duty to act reasonably in the exercise of his authority with respect and concern for the wellbeing of innocent bystanders is exactly the sort of harm which occurred in this case; thus the legal cause prong of the duty-risk analysis is also satisfied in this case.
The final prong of the duty-risk analysis is actual damages, which were without a doubt sustained in this case.
Thus, having found that Bellanger met her burden of proof to recover damages under Louisiana Civil Code art. 2315, we must affirm that portion of the trial court judgment awarding damages to Bellanger for Typhoon's death.
I concur with the majority opinion reversing the judgment of the trial court on the issue of false imprisonment.
HUGHES, J., dissenting.
I respectfully dissent.
The deputies asked permission to enter Ms. Bellanger's home because they believed a suspect from a crime committed approximately 6 hours earlier might be inside. Ms. Bellanger did not give permission. The deputies went in anyway and saw the suspect and an infant child. They ignored the child and laid hands on the suspect, known to them to be dangerous. The child died in the resulting shoot-out. All shots in the direction of the child came from the deputy that fired.
The actions of the officer after he was shot are not the issue. The child should have been secured before the suspect was apprehended. Police officers are charged with protecting the public. Apprehension of criminals must yield to this primary duty.
The actions of the officers are completely understandable and difficult to criticize, yet the child should have been secured. Therefore, I believe the officers bear some responsibility for what happened, as set forth by Judge Gaidry in his well-reasoned dissent.
NOTES
[1] Because of our resolution of the causation issue, we need not address the remaining assignments of error pertaining to the trial court's liability determination for Typhoon's death.